TRADE DOLLAR CONSOL. MINING CO. v. FRASER et al.

(Circuit Court of Appeals, Ninth Circuit. October 8, 1906.)

No. 1,305.

1. WATERS AND WATER COURSES—RIGHTS OF APPROPRIATOR—PROTECTION BY INJUNCTION.

A complainant corporation, which has made an appropriation of water from a stream in accordance with the laws of a state to be used in the generation of power for manufacturing and electrical purposes, and which has constructed a dam at large expense sufficient in height to enable it to use beneficially the quantity of water appropriated, is entitled to protection by injunction against a later appropriator, who for the purpose of obtaining the benefit of the dam is undertaking to take out ditches or canals a short distance above it, to be carried below around the ends of the dam, also for the purpose of generating power, where the effect would

be, not only by lowering the water to lessen the power and efficiency of complainant's plant, but also to endanger its dam by the proximity of the proposed ditches.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, §§ 331, 332.]

2. INJUNCTION—PROTECTION OF WATER RIGHTS—PROOF OF THREATENED INJURY.

Where defendants had filed an application for a permit to divert water from a stream which had been granted by the state authorities on their furnishing a plan of their proposed works, which plan if carried out would work irreparable injury to the plant of complainant, which was a prior appropriator, and defendants insisted upon their right and affirmed their intention to proceed in accordance with such plans, such facts sufficiently show a purpose and intention to interfere with complainant's water rights to warrant the granting of an injunction to restrain the threatened injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 9–13.]

3. SAME—ADEQUATE REMEDY AT LAW.

The fact that defendants, who claim the right to take water from a stream in accordance with plans approved by the state authorities, in carrying out such plans would be compelled to condemn right of way over the lands of complainant, who is a prior appropriator, will not debar complainant from the right to an injunction to restrain the building of such proposed works, where their construction would work irreparable injury to the plant of complainant and destroy the value of its prior water right, since its equitable rights could not be adequately protected in the condemnation proceeding.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 15–17.]

Appeal from the Circuit Court of the United States for the Central Division of the District of Idaho.

Johnson & Johnson and N. M. Ruick, for appellant.

Alfred A. Fraser, for appellees.

Before GILBERT and ROSS, Circuit Judges, and DE HAVEN, District Judge.

ROSS, Circuit Judge.    The case shows that one Joseph H. Hutchinson, the predecessor in interest of the appellant, by notice posted and recorded in January, 1900, claimed the right to the use of 10,000 cubic feet per second of the waters of Snake river, to be diverted therefrom at a point about 10 miles up the river from the town of Guffey, Owyhee county, Idaho, particularly identified by a large lava rock island near the center of the river, and which point is called Swan Falls. The purpose for which the appropriation was made was stated in the notice to be "power for motive, manufacturing, mechanical, electric light, electric power, and other useful and beneficial purposes, and for irrigation by means of pumping and otherwise." The notice further stated that the water was to be diverted by means of a dam, or else two canals or conduits, said dam to be constructed across the river at Swan Falls, particularly describing the dam site, and further stating that the water flowing at that point was "to be used for power for motive, manufacturing, mechanical, electric light, electric power and for pumping water for irrigation purposes in the counties of Ada, Canyon, Owyhee, Elmore, Lincoln, Cassia and other places in Idaho"; that plans and speci-

fications of the dam site would be filed with the state engineer of Idaho as required by law, and claiming five years in which to complete the dam or canals. In May following Hutchinson posted and caused to be recorded in the office of the recorder of the county another similar notice of the appropriation of the same waters for the same purposes, to be diverted at the same place, and that such diversion was to be by means of a dam, plans and specifications of which would be filed with the state engineer of Idaho, and designating the places of intended use, and further expressly stating that nothing therein was intended as a waiver of any rights claimed in his previous notice of January.

The appellant, a corporation organized and existing under and pursuant to the laws of the state of Kentucky, having acquired Hutchinson's rights, commenced and completed the construction of a dam across the river at the point indicated in the notice, plans for which were approved by the state engineer as required by a statute of the state, thereby creating a head of 19 feet of water, and installing a costly power plant not only of great present capacity but one intended to be, and susceptible of being, largely increased. While at the time of the commencement of this suit, and at the time of its trial in the court below, the appellant was only making use of 2,150 cubic feet per second of the waters of the river in the operation of its plant and the running of the four water wheels it had then installed, the undisputed evidence shows that in the construction of the dam provision was made for the installation of 12 more wheels of like capacity, the operation of which would require practically all of the water claimed. The evidence also shows that the cost of the works already completed exceeds $350,000, and that in the making of that large expenditure the appellant not only had in view additions to the equipment from time to time as the demand for power and the other purposes stated should arise, in the development of the region in which the plant is located, but had been actively engaged in the pursuit of its intention to enlarge the plant and apply all of the water claimed to a beneficial use.

A statute of the state of Idaho, where the property in question is situated, approved March 11, 1903 (Sess. Laws 1903, pp. 250–252), makes provision for just such a case. Sections 38 and 41 of that statute are as follows:

"Sec. 38. In allotting the waters of any stream by the district court according to the rights and priorities of those using such waters, such allotment shall be made to the use to which such water is beneficially applied, and when such water is used for irrigation the right confirmed by such decree or allotment shall be appurtenant to and shall become a part of the land which is irrigated by such water. Such right shall pass with the conveyance of such land and such decree shall prescribe the land to which such water shall become so appurtenant; and the amount of water so allotted shall never be in excess of the amount used for beneficial purposes for which such right is claimed; provided, that in the case of works capable of diverting more water than is applied to a beneficial purpose at the time the rights of the person or persons owning or using such works are adjudicated by the court, the right only to the water beneficially applied at the time of making such allotment shall be confirmed by the court, and the court shall ascertain the amount of water which can be diverted through such works in excess of such quantity beneficially applied, and shall set a time when such an amount shall be applied to the beneficial purposes for which it is intended, which time shall not exceed

four years from the date of the decree issued by such court under such adjudication, and any person using any of such water which was not beneficially applied at the time of such adjudication shall, before the expiration of the time set for such beneficial application, make proof of such beneficial use in the manner provided in section seven (7) of this act, and such right, when confirmed in the manner provided in this act, shall relate to the priority established by such court, and if such application of any of such water shall be made subsequent to such date then the priority of the right to the use thereof shall be determined in the manner provided in section eight (8) of this act."

"Sec. 41. All rights to divert and use the waters of this state for beneficial purposes shall hereafter be acquired and confirmed under the provisions of this act; and after the passage of this act all of the waters of this state shall be controlled and administered in the manner herein provided, and all acts or parts of which may be in conflict with this act are hereby repealed."

The case further shows that at the low-water stage of the river, which extends from August to November of each year, the volume of water flowing in the river at Swan Falls is only about 6,500 cubic feet per second. On the west side of the river is Owyhee county, and on the east side is Ada county, of the state of Idaho. After the building of appellant's dam and the consequent raising and backing of its waters until a head of 19 feet was thereby obtained, the defendants and one F. B. Whitin filed in the office of the engineer of the state, pursuant to the provisions of a statute of the state, two applications for permission to appropriate certain waters of the river for power purposes—one for a permit to appropriate 2,000 cubic feet per second to be diverted from the river at a point on the west bank thereof in Owyhee county, about 500 feet above the west end of the appellant's dam, and to be conducted to the point of intended use on the same bank of the river about 500 feet below the west end of the dam, by means of a ditch or canal 65 feet in width at the bottom, 81 feet in width at the water line, and with a depth of water of 8 feet; the other for a permit to appropriate 2,000 cubic feet per second to be diverted from the river on the other bank thereof in Ada county, about 400 feet above the east end of the appellant's dam, and to be conducted to the point of intended use on the same bank of the river about 500 feet below the east end of the dam, by means of a ditch or canal of like dimensions, and with like depth of water. Whitin having conveyed all of his interest in the applications and permits to the defendant Fraser, and the state engineer having returned both applications to the defendants for the purpose of correction, and having required a more definite and certain place of diversion and use of the waters and a survey of the proposed ditches or canals to be used in connection therewith, the defendants, on the 29th of November, 1904, returned to the state engineer their corrected applications, each accompanied by a plan and map of the proposed works for the diversion of the waters, on which day the state engineer approved each application and granted them a permit to appropriate the waters applied for, and to construct the proposed works, subject to the limitations and conditions that one-fifth of the work therein specified should be completed on or before May 29, 1907, that the whole of such work be completed on or before November 29, 1909, and that the time for the proof of the beneficial use of such waters extend to November 29, 1913. Those permits, with the maps and plans accompanying the same, were record-

ed in the records in the office of the state engineer. We assume that that officer was authorized to grant the permits to the defendants if they did not interfere with any vested right of the appellant. If they did so interfere, then, manifestly, to the extent of such interference they were and are invalid and of no effect.

Since the applications of the defendants and accompanying plans and maps show that the point of diversion of the waters applied for are but a few hundred feet above the appellant's dam, and the place of their intended use but a few hundred feet below it, and as the defendants' declared purpose of use is that of power, nothing can be plainer than that their sole object in so fixing the points of intended diversion was and is to avail themselves of the power created by the appellant's dam. If such use of the waters of the river would be without injury or damage to the appellant, perhaps it could not justly complain, but the record before us leaves no room to doubt that such diversion by the defendants would certainly work serious damage to the appellant and very likely destroy its dam. There is no conflict in the testimony upon the subject; indeed, it is all one way. We extract from the testimony of the witness Wiley, under whose directions appellant's works were constructed. Being asked to state what effect the defendants' diversion of the waters covered by their permits would have upon the appellant's dam and power plant, the witness answered:

"A. The construction of a canal around the south end of the dam would, in my opinion, result eventually in its destruction.

"Q. State your reasons for that conclusion.

"A. At this end of the dam the bed rock does not rise above the level of the old bed of the river, and is overlaid by a mixture of boulders and fine earth to which the dam is joined as securely as possible under such conditions; and the defendants' plans show a very large canal in this unstable material, carrying a flow of 5,000 cubic feet of water per second around the abutment of the dam, so close as to be practically in contact with it. Such a canal would be extremely hard to maintain, and a break in it would result in rapid erosion and the establishment of a new channel for the river around the south end of the dam, lowering the water to somewhere nearer its original level. Such a canal would also act as an effective barrier to any repairs that it might be necessary to make to the dam, and in this way also would be a constant menace. The dam in the south channel is of the rock-filled crib type and is filled and backed by material taken from the side hill adjacent to the south abutment, which is the only place where suitable material is available. It is necessary to have free access to this material in order to maintain the dam, and a quarry filled with cars and derrick is maintained here for this purpose, and has been used every year since the completion of the dam. The construction of the proposed canal would prevent the use of this quarry and will isolate the dam from all material needed in its maintenance. The proposed canal around the north end of the dam would be a menace to the safety of the dam, though not such a serious one as that around the south end; the material in the north shore being of a firmer nature, though even here we were not able to make a complete junction with the bed rock. The chief objection to the canal at this end is the obstacle it would present to the operation of the present plant and its prohibition of future extensions. The property of the company is located in a narrow canyon 700 feet below the general level of the country. There is barely room on the north side of the river for the location of the dwellings necessary for the employés of the company in the operation of its plant, and a canal with the proposed capacity of 5,000 cubic feet per second, as shown by defendants' map, would take away practically all the available ground in the vicinity of the complainant's property. Furthermore, the construction of both canals, as

proposed by the defendants, would leave the property of the complainant isolated from the mainland by canals which are virtually rivers themselves, and would be a most serious obstacle in the maintenance and operation of the plant.

"Q. What other effect would the diversion of the amount of water claimed by the defendants, through canals at each end of the complainant's dam, have upon the present power dam of the complainant?

"A. The diversion around the south end of the dam would only result in reducing the head acting upon the water wheels by the lowering of the water above the dam; but the diversion around the north end, on account of the condition of the river below, would result in not only reducing the elevation of the water above the dam, but would raise the elevation of the tail-water. The combined effect would reduce the velocity of the water wheels to such an extent as to render the entire equipment of water wheels, gearing, and electric generators inadequate for the work required, and it would be necessary to install a new equipment to meet the new conditions. Furthermore, the reduced head would require more expensive machinery to produce the same results, and would also require the use of a much larger volume of water.

"Q. What, in your opinion, has been the effect of the defendants' application for a permit to divert the water around the complainant's dam, upon the value of complainant's property?

"By Mr. Fraser: I object to that as immaterial, irrelevant, and incompetent. The witness has not shown himself competent to testify as to that question, and it is calling for a conclusion of the witness.

"A. It has, in my judgment, materially decreased the value of complainant's property by suggesting a flaw in complainant's title and making it difficult, if not impossible, to perfect plans for the extension of the plant, while there exists a possibility of defendants' right to divert any part of the water around complainant's dam."

The witness Irwin, who it appears is the general manager of the complainant company, after specifying the various mines and companies and towns and parties to which the complainant furnishes power and light, and the various steps that have been taken by the complainant to enlarge its plant and extend its operations, being asked to state what effect the construction of defendants' proposed works would have on the dam and power plant of the complainant, answered:

"A. I think the construction of a canal on the Owyhee county side would menace the property so seriously in my opinion that it would practically destroy it.

"Q. Give your reasons.

"A. My reasons for this are that the lava reef on which this dam rests does not run at right angles to the original course of the stream, and consequently the waters coming over the spillway are forced against the Owyhee county bank, and this causes a very strong eddy to be formed on that side of the river. This eddy has a tendancy to erode the bank back of the abutment and has already done so. In June, 1903, I received a telephone message from the superintendent in charge of the power plant that the fill back of this abutment was washing, and that it was necessary to take some immediate steps to protect the dam. I took a shift from the tunnel, and by special conveyance hurried them to the dam, and there found that this water or eddy had washed the riprap and fill back of the abutment on the Owyhee county side a distance of about four feet, and was still washing it at that time. We tried to fill this hole which the eddy had cut, and found that up to a distance of about 16 feet from the pier we could fill it, but from there on nothing would stay. We had this crew of men put in one rock that was practically five feet square, but it dropped into that hole and was lost to sight and apparently had no effect whatever. The erosive action of the water was finally stopped at that point by putting in rails and holding the water that way.

"By Mr. Nugent: Q. Steel rails?

"A. Well, track rails. This, of course, was merely a temporary expedient. It was adopted to keep the water from washing around this abutment. As soon as low water came in the fall, we proceeded to put in timber cribs below this abutment and had them filled with rock, and we thought we had the situation well under control. But in 1904, at the high-water stage, a telephone message from the power plant again summoned us to the river, as this time the riprap work above the pier was being cut out and one of the bulkheads in the crib, which was put in the preceding summer, had been practically cut out and the rock settled through it. We took a crew of men and had them working probably for two weeks repairing the damage that the high water was doing at that time. Up above the dam on the Owyhee county side there is one place where you can see a sink hole probably five feet in diameter, through which the water at the medium stage of the river runs. Where it runs to we don't know, but we were afraid of it, and this year we are having that excavated and a crib filled with rock and dirt built above the dam to afford additional protection at this point. The fact that the concrete masonry is not joined to rock on the Owyhee county side, but is simply tied to the boulders and loose ground there, makes it a very difficult point to hold; and, from the force of the water that I have witnessed and had a little experience with in handling, these two sets of difficulties that we have had during the high-water period have convinced me that, no matter whether all the men you could get and all the money that you could have back of you was available, nothing would prevent the destruction of that dam, if the water at high-water season cut around the south pier.

"Q. What would be the effect of the construction of such a canal as is contemplated by the defendants?

"By Mr. Fraser: I object to that for the reason that the defendant has not shown himself competent to answer the question.

"A. It would cut us off from the quarry that we use in getting the fill to make these repairs that we use in the high-water season, and would, in my opinion, be very apt to cause erosion there that would practically give the river a new channel around that south pier. It would practically destroy the dam.

"Q. From your knowledge of the circumstances there and the condition of the soil, could such canal be safely constructed?

"A. I don't think it could. On the north side of the dam the principal damage would be the lowering of the head and cutting our power house off from the mainland. In addition to this the tail-water at this side would necessarily raise on account of the islands which lie directly below on the Ada county or north side of the river, which would have a tendency to back the water up and raise the tail-water as well as decreasing the efficiency of the machines."

There is no contradiction of this testimony in the record, but, on the contrary, other evidence therein in confirmation of it. In the opinion of the court below it is said:

"There is one proposition involved in this case which seems clear. The complainant has erected a dam across that river, by which it creates a waterfall of 19 feet where practically none before existed, and thereby it has created a power for its plant. This 19-foot fall exists only while the dam is filled to the top, and, of course, any decrease in the height of the water lessens the power and efficiency of the plant accordingly. The complainant is entitled to such protection of this dam that the water in it shall not be lowered below the 19 feet by the erection of any other works by any other parties."

But the court below held that, inasmuch as, in its opinion, there was not a sufficient showing of an intention on the part of the defendants to divert the water claimed by them, the complainant was not entitled to any injunction.

We agree with the court below that the appellant is entitled to maintain the head of water created by the dam, for the reason that it was,

as against the defendants, the prior appropriator, and because the undisputed evidence shows that any decrease in the height of the water must necessarily lessen the power and efficiency of the appellant's plant. But there is another reason, equally potent, why the defendants are not entitled to make the diversion of the waters claimed by them in pursuance of the permits granted to them. The uncontradicted evidence clearly shows that the diversion of the waters claimed by the defendants by means of the contemplated canals and ditches, in such close proximity to the appellant's dam, would not only seriously endanger its security, but very likely work its destruction. That fact of itself would necessarily work irreparable injury to the appellant, for the uncertainty in respect to the stability of the appellant's works and the continuing danger of their destruction would not only necessarily depreciate the value of them, but practically put an end to the appellant's contemplated enlargement and extension of its plant. We therefore entertain no doubt that the appellant is entitled to an injunction protecting it against the diversion of the waters claimed by the defendants in pursuance of the permits granted to them by the state of Idaho, if the case sufficiently shows the purpose of the defendants to commit the wrongs complained of. The court below was of the opinion that it did not, relying in its opinion upon what is said in section 198 of Kerr on Injunctions, and upon this quotation from the opinion of the court in the case of Church v. Maschop, 10 N. J. Eq. 57:

"The court cannot grant an injunction to allay the fears and apprehensions of individuals. They must show the court that the acts against which they ask for protection are not only threatened, but will in all probability be committed to their injury."

The section from Kerr on Injunctions is as follows:

"The mere prospect or apprehension of injury, or the mere belief that the act complained of may or will be done, is not sufficient; but, if an intention to do the act complained of can be shown to exist, or if a man insists on his right to do, or begins to do, or threatens to do, or gives notice of his intention to do, an act which must, in the opinion of the court, if completed, give a ground of action, there is a foundation for the exercise of the jurisdiction. The mere denial of a man of his intention to do an act or to infringe a right will not prevent the court from interfering; but, if a man asserts positively that it is not his intenion to do a certain act or infringe a certain right, and there is no evidence to show any intention on his part to do the act or infringe the right, the court will not interfere."

We find no fault with the law as thus declared, but are of the opinion that the record in the present case not only shows the intention on the part of the defendants to commit the acts complained of, but that even in their answer they do not make any unqualified denial of such intention. The bill charges that the defendants, against the complainant's will and in violation of its rights, threaten and intend to commence the construction of the canals of the dimensions indicated in the permits issued to them, and in accordance with the plans annexed thereto, for the purpose of diverting 2,000 cubic feet of the waters of the river around each end of the complainant's dam. In their answer the defendants do not make any unqualified denial of such intention and purpose on their part, but aver:

"That they and their predecessors in interest, in securing the permits referred to in the complainant's bill, and which are relied upon by these defendants for their rights and privileges in the premises, acted in good faith and with the sole object and purpose of acquiring the right to use the unappropriated waters of Snake river at said point to the extent of 4,000 cubic feet and of maturing plans for power plant and financing said proposition so as to conduct said power to Boise City and other places for sale for mechanical, lighting, and other purposes. These defendants aver that so far these defendants have proceeded no farther than to comply with the laws of the state of Idaho with reference to securing said permits from the state engineer, which permits have been duly and regularly granted; that said defendants do not purpose or intend to go upon said ground of the complainant or attempt to construct said canals or in any manner interfere with said premises until they have filed their suit in condemnation for a right of way for its said canal and the right to use said property, which will not be done for some four or five months, as defendants are now engaged in matters connected with the said business solely, aside from the work upon the ground such as financing said proposition, which matters are now well advanced; that in all matters relative to defendants' rights they intend to proceed by legal methods and in an orderly way, and will not in any event attempt work upon said ground or attempt to divert said water, or to initiate the construction of said canals until permitted so to do by a court having jurisdiction of matters relative to proceedings in condemnation, and will proceed alone in accordance with the laws and statutes of this state relative to acquiring rights by condemnation. Defendants allege that they do not intend to trespass upon said premises or in any way interfere with the complainant's free and uninterrupted use of said waters until their rights have been determined."

Inasmuch as the condemnation proceedings here referred to are for the rights of way for the canals indicated on the plans annexed to the permits, it appears from the defendants' own answer that they intend to commit the acts complained of, and insist upon their right to do so. These threatened acts of the defendants would, according to the evidence, necessarily lessen the efficiency of the complainant's plant, be continuing in their nature, and be very likely to absolutely destroy its dam, and as a consequence its entire plant. An injunction lies to restrain threatened permanent interference with water rights (Angel on Water Courses, § 444 et seq.), and, whenever there is a threat and intent to wrongfully enter upon another's real property and to take permanent possession thereof and effect a permanent lodgment there, the threatened injury is "irreparable in itself, and the insolvency of the intruder or the actual damage which may ensue is immaterial." More v. Massini, 32 Cal. 595; Richards v. Dower, 64 Cal. 62, 28 Pac. 113; Crescent City Wharf & Lighter Co. v. A. M. Simpson, 77 Cal. 290, 19 Pac. 426. Although it appears that the appellant is the owner of the lands through which the defendants propose to build their canals, and therefore would necessarily be the party defendant to such condemnation proceedings, it is manifest that its equitable rights could not be there fully protected, if protected at all. Where such is the case, it is well settled that a remedy afforded by an action at law is no bar to the maintenance of a suit in equity. Kilbourne v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005; Boyce v. Grundy, 3 Pet. 210, 7 L. Ed. 655; Southern Pacific Railroad Co. v. U. S., 133 Fed. 651, 66 C. C. A. 581, and cases there cited.

Our conclusion is that the appellant is entitled to an injunction restraining the defendants from making the diversions of the waters

covered by the permits issued to them at the points or through the ditches or canals indicated on the plans accompanying them, and from any diversion of the waters of the river that will interfere with the head of water created by the appellant's dam, or in any way injure or destroy its works.

We are further of the opinion that the court below should, in accordance with the provisions of the statute of Idaho above quoted, have by its decree fixed, within the limits of the appellant's appropriation, the amount of water which can be diverted by its works, and should have fixed a time not exceeding four years from the date of the decree within which the remainder of the water covered by the appellant's appropriation, not already applied to beneficial use, should be so applied. That such, in the opinion of the court below, was the appellant's right under the statute of Idaho appears from this clause of its opinion:

"Beyond question, under our laws, a party may be protected in the use of all the water he actually appropriates and uses, even if it be every drop that flows in as great a river as the Snake. Not only that, but when he has used but a part of what he claims, he will be allowed a reasonable time to make use of the balance, provided he shows by his work and improvements good faith in reducing all he claims to his actual use."

In the opinion of the court below there is no indication of any lack of good faith on the part of the appellant, nor do we discover any in the evidence. Yet the court below refused to award appellant the relief contemplated by the provisions of the statute above quoted, and confined the relief given to the quieting of the appellant's title, as against the claims of the defendants, to the 2,150 cubic feet per second of the waters of the river already applied by it to a beneficial use.

For the reasons stated, the judgment is reversed, and the cause remanded to the court below for further proceedings in accordance with views above expressed.