WORTHEN & ALDRICH

*v.*

WHITE SPRING PAPER COMPANY.

[Submitted May 18th, 1908.   Decided June 10th, 1908.]

1. A riparian proprietor is entitled to a reasonable use of the waters of a stream, but the use must be lawful, and must be exercised with due regard to the lawful rights of a lower proprietor, and he cannot pollute the stream to the injury of a lower proprietor.

2. An appreciable discharge, into a natural water course, of any noisome substance is within the law prohibiting a riparian proprietor from polluting a stream to the injury of another proprietor.

3. A riparian proprietor, operating a paper mill, placed in a natural water course large quantities of waste cotton fibre. The deposit was in such quantities as to be visible to the eye in the discoloration of the water, &c. The material polluted the water, and seriously damaged a lower proprietor in the enjoyment of his property.—*Held,* that the use of the stream was neither reasonable nor lawful, warranting relief in equity at the suit of the lower proprietor.

4. A. riparian proprietor, being entitled to have the water of a natural stream come to him in an unpolluted condition, is not required to use any precautions to prevent the polluting of his materials used in his bleachery.

5. A lower riparian proprietor, instituting a suit to enjoin an upper proprietor from polluting the waters of the stream, is entitled to the relief demanded, though the upper proprietor has installed appliances to prevent pollution, especially where such appliances are liable to give way, since without injunctive relief the upper proprietor may discontinue the use of the safety devices, and permit injury to the lower proprietor.

6. A lower riparian proprietor is entitled to maintain a suit to enjoin an upper proprietor from polluting the waters of a stream, and he is not required to seek his remedy at law for damages.

7. Apart from interfering grants, riparian proprietors have correlative. rights in the waters of a stream, such rights being usufructuary.

8. One can have no easement in his own lands.

9. A riparian proprietor conveyed a part of the premises to a purchaser, retaining a tract lower down the stream, a natural water course. The conveyance contained no reservation of rights in the tract below. Subsequently the tract below was sold to a third person.—*Held,* that no equity arose in favor of the earlier conveyance. though there was a more ancient structure on the property so conveyed than on the tract conveyed to the third person.

On final hearing on bill, answer, replication and proofs.

The bill in this case is filed for the purpose of enjoining the defendant from polluting the waters of the Yantacaw river and pond. The parties claim one common source of title, the lands having belonged prior to 1892 to one Kingsland, who, on August 13th, 1892, made conveyance of the defendant's property to a corporation under which the defendant now claims title; and on May 20th, 1895, conveyed to the complainant the land which it now occupies. The Yantacaw river runs through the lands of both parties and forms the pond on or near to the complainant's property known as Yantacaw pond. The complainant is engaged in the business of bleaching, dyeing and finishing cotton cloths. It has erected a large bleachery on its property and has expended in buildings and machinery approximately $500,000. It employs about six hundred men. It requires a large supply of pure water, about three to six million gallons daily, and it originally located its plant on the stream in question for the reason

that it was capable of supplying a large amount of uncontaminated water daily. The defendant is an upper riparian proprietor and is engaged in the manufacture of paper from pure cotton and linen rags in a mill which is very ancient, situated about a quarter of a mile up the stream from the works of the complainant, on the north side of a public highway known as Kingsland's lane. The river flows through the defendant's property in a northerly direction, thence turns to the east and then to the south, forming in its southerly course the Yantacaw pond, whence it passes directly alongside of the complainant's bleachery. The defendant obtains water for its mill by means of a head-race starting from Kingsland's pond, situated on the south side of Kingsland's lane, which head-race runs parallel to the course of the river and empties into it about nine hundred feet north of and below the defendant's mill. Nearly opposite the point where the tail-race joins the river there begins a canal which carries water on a level somewhat higher than that of the river to a point near the complainant's mill, and is there discharged from the canal into a pipe line which carries the supply across the road and into the premises of the complainant. The head of the water in the canal is somewhat higher than the head of the water in the Yantacaw pond, but it flows from each by gravity into the complainant's premises which are on a lower level than either. The source of the complainant's water-supply is therefore twofold, one from the canal, the other from the pond, but both the canal and the pond derive their supply from the river. The complainant erected its plant and began the operation of it shortly after it was constructed, in 1895. The defendant began its operations in the paper mill up the stream about ten years later. After the defendant's mill went into operation the complainant almost immediately experienced a difficulty in the bleaching, dyeing and finishing of its goods, and upon examination discovered that the difficulty arose from the close adherence to the fabrics which it was manipulating of small particles of cotton fibre which showed themselves with more or less distinctness at different times on the surface of the cloth. It interfered with the processes to which the cloths were subjected and rendered it necessary to subject the fabrics to other new and

distinct operations in order to remove the same. On making an examination into the cause of it, and upon inspection of the canal and the waters of the river they found that there were large quantities of cotton fibre floating in both sources of their water-supply, and they finally traced it within a very short time to the mill of the defendant. An examination of the cotton cloths reveals the fact that some of the specimens which were produced as exhibits were soiled with small spots of mud. Without at this time going into the details thereof, it may be said that there was no proof of the cause of the mud spots. It is highly probable, however, that they were produced at a time when the waters of the stream or canal were being agitated, but by whom or for what purpose the evidence does not show. In the operation of the defendant's mill large quantities of pure spring water were used which came from a large natural spring located a little to the westward of the defendant's mill. This water was used in large quantities, and there was at all times while the mill was in operation an unbroken flow of water from the paper mill which was impregnated with cotton fibre that overflowed into the tail-race and thence into the waters of the river, whence the same was taken up by the canal and in the pond and so delivered with the water into complainant's washing machines. Complaint was made to the defendant and its officers; they acknowledged the pollution and promised to do what they could to remedy the fault.

The complainant being dissatisfied with the efforts made by the defendant to keep the stream unpolluted, on February 8th, 1906, filed its bill of complaint against the defendant, alleging the facts indicated by the foregoing statement, claiming that the pollution complained of had been carried on to the complainant's damage for upwards of three months prior to the filing of the bill; that a large amount of the waste material from the paper mill had accumulated along the banks and in the bed of the river and canal; that the situation was continually growing worse, and claiming that it was entitled to have the waters of the river flow past and through its lands unimpaired in quality and in quantity, except by the reasonable and lawful use of the same by the defendant, and praying that the defendant might be restrained from the further pollution of the waters

of the river, canal and pond, and from the discharge into the river of the said waste material or other foreign substances. Upon the filing of the bill an order was made requiring the defendant to show cause on February 19th, 1906, why an injunction should not issue according to the prayer of the bill, and in the meantime the defendant was enjoined from further discharging into the waters of the river by way of its tail-race or otherwise waste material or foreign substances of any kind calculated to pollute or contaminate the waters of the river beyond what is a reasonable and lawful use of the same. On March 3d, 1906, this restraint was continued till the further order of the court. I do not find that this order has been vacated or varied. Shortly after it was served, proceedings were taken to punish the defendant for contempt in disobeying the order, which proceedings continued for a month or more and were finally ended in the month of April, 1906. The defendant had apparently taken steps to obviate the cause of complaint. The complainant likewise made corresponding efforts on its own property by the use of screens composed of wire having a very fine mesh, and other screens filled with excelsior, and although the complainant's witnesses testify that the efforts did not entirely succeed, it is quite manifest that they did succeed to some extent, and the suit was allowed to lie without further prosecution or defence until the early part of 1907. In the spring of that year, on account of what the defendant claims was an accident in its mill, there was quite a large amount of cotton fibre deposited in the tail-race, which found its way to the complainant's washing and bleaching machines. Defendant in the meantime had not answered the bill, although its time to do so had expired in the month of April, 1906, about a year before. An answer was filed on May 3d, 1907, in which the defendant denies the pollution complained of and the damage to the complainant which is charged in the bill, and states that after the bill was filed the defendant made zealous and earnest efforts not only to prevent the discharge of any more fibre into the stream beyond what was a reasonable and lawful use of the same, but directed its efforts to preventing the discharge of any fibre whatsoever into the stream, and for the accomplishment of this end that it had es-

tablished settling tanks and had installed a machine called a saveall machine, the purpose of which was to extract the greatest possible amount of fibre from the spring water discharged by the defendant into the tail-race, and that the defendant had then (May 3d, 1907) established in connection with the said machine an extensive sump, into which all the waters passing from the mill were discharged and from which sump the waters were discharged into the river after filtration through filters constructed of coal ashes, and that these devices had prevented the discharge of any deleterious matter into the river. A replication was filed to this answer, and the cause came on for hearing January 6th, 1908. On that day the complainant obtained leave to amend its bill by alleging that the contrivances which had been established by the defendant to prevent the discharge of any and all fibre into the stream were inefficient to prevent such discharge, to which the defendant filed a supplementary answer, not denying the allegations of the amended bill, but merely alleging that it had greatly extended the sump system referred to in its answer, and that it had then four separate but connected sumps of the same character as the one mentioned in the answer, which were then in full operation. The hearing was continued for the purpose of allowing these amendments, and it finally came on for final hearing on amended pleadings and proofs in the early part of 1908.

*Mr. William I. Lewis* and *Mr. Henry C. Whitehead,* for the complainant.

*Mr. Albert C. Wall,* for the defendant.

HOWELL, V. C.

During the hearing and upon the argument the defendant's counsel laid much stress upon the manner in which the complainant had set out the measure and extent of its rights in the stream, holding that it had limited them by claiming merely that it was entitled to have the waters of the stream flow through and past its premises unimpaired in quantity and in quality except by the reasonable and lawful use of the same by the upper

riparian owners, and that the use which the defendant had made of the stream, permitting small quantities of cotton fibre to pollute it, was consistent with a reasonable and lawful use, and that thus the complainant had stated itself out of court. This contention, however, is not entitled to any force as a defence to the fact of pollution. The defendant is, of course, entitled to a reasonable use of the waters of the stream, but that use must be lawful and must be exercised with a due regard to the lawful rights of lower proprietors, and especially is this true with regard to the charge of pollution. In *Holsman* v. *Boiling Spring Bleaching Co., 14 N. J. Eq. (1 McCart.) 335 (1862)*, complaint was made of the pollution of a small stream which ran through the complainant's land and emptied into the Passaic river only a short distance above the mouth of the Yantacaw river. The complaint was that the defendant had permitted large quantities of chemical matter and other impurities to be discharged from its works into the stream above the land of the complainants, and that the water was thereby filled with offensive matter, was discolored and polluted and rendered unfit for all domestic purposes, for procuring ice or watering cattle; that it killed the fish and produced offensive odors which invaded the air of the neighborhood and penetrated the complainants' dwelling, so that the complainants had been compelled to refrain from all use of the water for family or other purposes. Chancellor Green says: "The defendants have a right to use the water upon their own soil in such manner as they may deem for their interest, provided they discharge it upon the soil of the complainants in its accustomed channel pure and unpolluted." And he held that the complainants were entitled to an injunction to restrain defendants from discharging offensive matter into the stream and thereby polluting the waters which flowed upon the complainants' land.

In *Acquackanonk Water Co.* v. *Watson, 29 N. J. Eq. (2 Stew.) 366 (1878)*, an attempt was made by a private water company to take water from a stream which supplied the defendant's bleachery, as a source of water-supply for the city of Passaic, it undertaking to furnish to the complainant another source of supply from another stream. The court (Honorable Amzi Dodd,

special master, writing the opinion) granted the injunction prayed for upon the ground that no proprietor has a right to use the water of a running stream to the prejudice of other proprietors above or below him unless he has a prior right to divert it or a title to some exclusive enjoyment; that he has no property in the water itself, but a simple usufruct while it passes along, and that he must so use and apply the water as to work no material injury or annoyance to his neighbor below him, who has an equal right to the subsequent use of the same water. The decree in this case was affirmed by the court of errors and appeals. The same doctrine was laid down by Vice-Chancellor Pitney, in *Beach* v. *Sterling Iron and Zinc Co., 54 N. J. Eq. (9 Dick.) 65 (1895)*; *affirmed, 55 N. J. Eq. (10 Dick.) 824*, in the opinion in which he cites all the leading English and American cases on the subject, and in *Attorney-General* v. *Paterson, 58 N. J. Eq. (13 Dick.) 9 (1899)*; *Simmons* v. *Paterson, 60 N. J. Eq. (15 Dick.) 390 (1899)*, and in a masterly opinion by Judge Vann, in *Strobel* v. *Kerr Salt Co., 164 N. Y. 303*, in which the New York court of appeals followed Vice-Chancellor Pitney's ruling in the *Beach Case*, and refused to recognize the Pennsylvania doctrine, which relaxes the ordinary rules governing the rights of riparian owners in favor of great industries engaged in developing the natural resources of the country.

An appreciable discharge, into a natural water course, of any noisome substance is within the prohibition of the law. In the case at bar the pollution consisted of placing in the stream large quantities of waste cotton fibre, the particles of which varied in length from one-thirty-second to three-eighths of an inch and at times the deposit was in such quantities as to be actually visible to the eye in the discoloration of the water of the canal and river and in the deposit of quantities of the same material on the ground forming the banks and beds of these waterways. And at other times it was deposited in such large quantities as to be visible in the tail-race and in the stream in floating flocks or lumps, and at other times it was deposited in large quantities upon the screens and other apparatus and devices which were placed by the complainant in the canal for the pur-

pose of screening the water before it went to the complainant's bleachery. There is no question on the evidence of the deleterious character of the polluting material, nor of the fact that it appeared in the waterways above described in such quantities as to seriously damage the complainant in the enjoyment of its property, nor of the further fact that it appeared in the washing machine in the works of the complainant in damaging quantities, and at times to such extent as to compel the complainant to shut down portions of its machinery and discontinue portions of its works. This was not and is not either a reasonable or a lawful use of the waters of the river, and at the time the bill was filed, in my opinion, the facts and circumstances warranted the complaint which the complainant made in the court.

Pending the suit the defendant introduced several devices to prevent the pollution of the stream by its waste water charged with cotton fibre, and in its answer tenders to the complainant the issue whether these devices are efficient. Their efficiency is denied by the amended bill. The first device that was installed, after trials of apparatus which was of no advantage whatever, was a machine called a saveall machine. This seems not to have been sufficient in itself to stop the pollution of the stream, and subsequently large settling basins were constructed into which the waste water from the paper mill was conducted, the design being that the waste water should remain in the settling basins for a sufficient length of time to allow the fibrous matter to precipitate. While the complainant vigorously denies the efficiency of this device, it does appear that there has not been so much cause of complaint as there was before they were constructed, and that the efforts of the defendant, aided by those of the complainant, have to an extent stopped the introduction of the cotton fibre into the bleachery of the complainant; but if the law is as it is above stated there seems to be no reason why the complainant should be put to any expense whatever in fending against the polluting material in the stream and canal, or be under an obligation to make any suggestions or give any advice as to proper methods to be adopted. If it is entitled to have the water come to it in an unpolluted condition, it ought not to be compelled to use any precautions to prevent the polluting material from entering

its bleachery; but if it were proved that the settling basins or sumps as they are now arranged were entirely sufficient to restrain the polluting material from flowing into the stream, yet the complainant is, under the circumstances, still entitled to a continuance of the injunction which is now in force against the defendant. There was much evidence in the case relating to the character of the construction of these settling basins. They were described and illustrated by diagrams by a surveyor from actual measurements made by him; they were further described by expert engineers and criticised because of their flimsy and unsubstantial character. They consist of logs piled up against stakes which are driven in the ground, and are lined with coal ashes. They are liable to give way by reason of the breaking of the stakes or by the action of the frost, and from other causes which are described by the witnesses. If they are efficient to restrain the cotton fibre from entering the stream they ought to be kept in repair or made permanent constructions so as to prevent deleterious matter from ever getting to the complainant's property. The case is in this aspect controlled by *Beach* v. *Sterling Iron and Zinc Co., 54 N. J. Eq. (9 Dick.) 65*. There similar settling basins had been constructed, but the vice-chancellor determined that it was impossible to say that there would be no further incursions of the muddy water, that without a decree and injunction the defendant would be at liberty to discontinue the use of these safety devices and permit muddy water again to flow into the complainant's supply as it had done. There is an additional argument to the same effect in this case, and that is the unstable construction of the settling basins. Without a decree and an injunction the defendant would not only be at liberty to discontinue the use of the settling basins, but would also be at liberty to allow them to become absolutely inefficient for the purpose for which they were designed.

The claim made by the defendant that the complainant's remedy for the injury is by common law action for damages is effectually disposed of by the *Beach Case*.

Lastly, the defendant claims that inasmuch as its mill is an ancient mill and was severed from the common ownership by the common proprietor at an earlier date than the conveyance by him

of the property of the complainant, an equity arises in favor of the more ancient structure and the earlier conveyance. It must be remembered that the stream in question is a natural water course, and that apart from interfering grants riparian proprietors have correlative rights in the waters of the stream, these rights being usufructuary. The fact that Kingsland made the earlier conveyance of the paper mill, retaining the tract lower down the stream now belonging to the complainant, cannot interfere with the rule of law, nor, indeed, could anything interfere with it except a positive reservation by Kingsland in the earlier conveyance of rights in the tract of land below. This question was settled in this state in 1854 in *Brakely* v. *Sharp, 10 N. J. Eq. (2 Stock.) 206,* upon a state of facts touching the relations between upper and lower proprietors resembling very much of the facts in this case. There the earlier conveyance from the common proprietor covered the tract furthest up stream. In the opinion Chancellor Williamson lays down the rule as follows: "There is a difference between a natural water course and an artificial construction for the conveyance of water. A is the owner of two farms through which runs a natural stream; he sells to B the farm upon which the water course has its origin. A is entitled to have the water flow upon the farm which he reserves the same as he enjoyed it when he severed his title, because the water course did not begin by the consent or act of the parties, but *ex jure naturæ.*" citing *Hazard* v. *Robinson, 3 Mason 272.*

Kingsland might have reserved a right which would have created an easement in favor of the upper proprietor, but it cannot be said that the situation now in the present state of affairs is governed by the law of easements. A man can have no easement in his own lands. The owner of the Kingsland paper mill could not have an easement in the property now owned by the complainant as long as the title was in himself. There is no prescriptive right claimed, nor, indeed, is there any evidence of a prescriptive right before the court.

The case differs from *McConnell* v. *American Bronze Powder Co., 41 N. J. Eq. (14 Stew.) 449; affirmed, 44 N. J. Eq. (17 Stew.) 603.* There the nuisance complained of was the raising

42

of a dam. Pending the litigation the ·dam was cut down to its accustomed height, and thus the objection was wholly removed, and this having been established, the case resolved itself into a mere question of costs. It will be perceived that the difference between the two cases is essential and fundamental. In the *Mc-Connell Case* the cause of action was abated; in the present case it is clearly in a position to work harm to the complainant by simple inattention to or negligence of the conditions surrounding the situation.

I will advise a decree declaring that the complainant has a right to have the water of the river and its subsidiary waterway, the canal, flow to and upon the premises in its natural and unpolluted state and condition, and that as to the pollution by the defendant, it be restrained from further discharging into the waters of the river waste material or foreign substance of any kind calculated to pollute or contaminate the waters thereof.