[Sac. No. 4874.   In Bank.—September 2, 1936.]

CITY OF LODI (a Municipal Corporation), Respondent, v. EAST BAY MUNICIPAL UTILITY DISTRICT (a Public Corporation) et al., Appellants.

T. P. Wittschen, L. W. Irving, Harold Raines, George F. McNoble, Thomas J. Straub, William B. Bosley and Robert H. Gerdes, for Appellants.

Glenn West, City Attorney, Robert M. Searls and Humphrey, Searls, Doyle & MacMillan for Respondent.

SHENK, J.—This action was brought by the City of Lodi against the East Bay Municipal Utility District and the Pacific Gas and Electric Company to establish: (1) the plaintiff's right as against the defendants to appropriate, for municipal purposes, a specified quantity of water by means of wells penetrating the underground water strata, alleged to be supplied by percolation from the Mokelumne River; (2) to establish that the plaintiff's right so to appropriate the specified quantity of water is prior in time and superior to any right of either defendant to appropriate water from the Mokelumne River; and (3) to secure an in-

junction to restrain the defendants from storing or diverting any water from the Mokelumne River, or from regulating the flow thereof, so that the water table in the underground strata from which the plaintiff obtains its supply is lowered to the plaintiff's damage.

It is conceded that there is no community of interest or of action between the two defendants. Each defendant has constructed, or is about to construct, certain storage, diverting and other works in the Mokelumne River or its tributaries upstream from Lodi. These works are designed either to divert the water out of the watershed, or artificially to regulate and to interfere with the natural flow of the stream. Each defendant answered separately, and upon judgment going in favor of the plaintiff each has separately appealed.

The City of Lodi is situated in San Joaquin County, its northerly boundary being about one-half mile from the Mokelumne River. The city has a population of about 8,000 and is located in the center of a prosperous and fertile farming community. For municipal purposes the city constructed a municipal waterworks at a cost of about $160,000, including pumping plants and distributing system. The source of supply for this municipal water system is from a series of wells and pumping plants all located within the city limits. These wells are located on tracts of land owned or leased by the city and are on the average about one mile south of the Mokelumne River. For more than five years immediately preceding the commencement of this action the city, by means of these pumping plants, has pumped for municipal purposes a maximum of 6,000,000 gallons daily and an average of 3,000,000 gallons daily. In terms of acre-feet, the city for many years has pumped from these wells, its sole present source of supply, about 3,600 acre-feet annually. Assuming that the Mokelumne River is the source of supply for these wells, there is no serious dispute on the issue that the city's right to a maximum of 6,000,000 gallons daily and a total of 3,600 acre-feet annually is prior in time and right to any claim of either of the defendants, except as to the defendant Pacific Gas and Electric Company's "old" water rights, which are hereinafter described and which are admittedly prior in right to the city's water right.

The Mokelumne River is a natural stream having its sources in the Sierra Nevada, a mountain range, about 90

miles easterly from the City of Lodi. It flows southwesterly from its source to its confluence with the San Joaquin River, about 17 miles southwesterly from the City of Lodi. During its course the river flows through San Joaquin County for a distance of about 40 miles, passing the City of Lodi approximately one-half mile northerly therefrom at the nearest point. From where the river emerges from the foothills easterly of Lodi to opposite the city, it flows through sandy bottom lands lying between terraces of slight elevation.

The Mokelumne is a typical Sierra stream and has a great variation in flow, not only from season to season, but from year to year. The maximum seasonal flow occurs in late spring or early summer, and is caused by the melting snows in the Sierra Nevada. The normal maximum seasonal flow approximates 3,500 second-feet, and the normal minimum seasonal flow approximates 100 second-feet. Stated in acre-feet, the average annual run-off measured at Clements, some distance upstream from Lodi, is approximately 815,000 acre-feet, varying, however, from a maximum annual run-off of over 1,500,000 acre-feet to a minimum annual run-off of about 200,000 acre-feet.

The soil through which the Mokelumne flows between Clements and the delta is the ordinary sedimentary soil of the San Joaquin Valley, possessing a high degree of porosity. As a result, the Mokelumne loses a portion of its flow by percolation into the surrounding territory. It is the plaintiff's theory, and the trial court found, that the underground waters which are penetrated by its wells, receive their sole source of replenishment from percolation of the waters of the Mokelumne River, and are therefore directly affected by any material lessening of the flow, or by the cutting down of the high flow by means of artificial regulation.

The defendant East Bay Municipal Utility District, hereinafter called the District, was organized in 1923. Its boundaries include the metropolitan area of Alameda and Contra Costa Counties, embracing nine cities and some adjacent unincorporated territory. The population of this district is over one-half million inhabitants. The demands for water for municipal purposes in this area exceeded the available supply, and it was to meet this emergency that the District was organized. In 1924 the District filed applications with

the division of water rights for permits authorizing it ultimately to divert 224,000 acre-feet annually from the Mokelumne River to the District's metropolitan area in Alameda and Contra Costa Counties for domestic and municipal purposes. To accomplish these purposes, the District requested a permit from the division of water rights to construct a storage reservoir in the Mokelumne River, about 25 or 30 miles upstream from Lodi, with a capacity of 220,000 acre-feet, allowing 4,000 acre-feet for evaporation. These permits, subject to vested rights and to certain other conditions, were granted. In September, 1925, the District let the contracts for the construction of the major unit of the project, the Pardee reservoir. Condemnation proceedings were necessary to secure the reservoir site, which were not completed until June of 1927. Actual construction of the Pardee reservoir commenced at that time. In March of 1929 the District commenced storing a portion of the flow of the Mokelumne River in the reservoir, and in June, 1929, water was first diverted through the aqueduct lines to the District. The present action was commenced on December 31, 1928. From 1929 to the time of trial, which started in September, 1932, the District, after filling its reservoir, has actually diverted outside the watershed about 56,000 acre-feet annually, or about one-quarter of its ultimate diversions. It is not disputed that the District will not divert the full 220,000 acre-feet annually for many years.

In connection with its reservoir the District has constructed a powerhouse for the generation of electric energy by the use of water discharged through the dam. The discharge outlets from the dam have a maximum capacity of 4,000 second-feet, of which 750 second-feet can be passed through the powerhouse.

In the permits of the District the right of the District to impound the water and to divert it out of the watershed was not only made subject to the vested rights of prior users, but also in the opinion and order of the division of water rights it was specifically provided that the District was under the responsibility of not injuring the underground water users, downstream from the dam. The permit expressly required the District to make a study of underground percolation and of the effect on the underground supply of the regulation of the stream and the diversion of

a substantial portion of the flow. The power permits of the District, as distinguished from its water permits, expressly provided not only that they were subject to vested rights, but "the right to store and use water for power purposes acquired under this permit shall not interfere with future appropriations of said water for agricultural or municipal purposes".

In order to carry out its obligations under its permits, and at its own expense, in part, the District arranged with the United States Geological Survey for a thorough investigation of the surface and underground water conditions, and the effect of the District's operations on the underground supply. The Survey commenced its operations in 1926, and in connection therewith issued various reports. Its investigations were not complete at the time of the trial. The Survey secured as far as possible the record and history of every well in an area far larger than the 34,000 acres found by the trial court to constitute the Lodi area, but including that area. From its reports introduced into evidence in the present case, it is obvious that the Survey has made and is attempting to make an exhaustive and comprehensive investigation of the problems presented to it. The various reports of the Survey were made available to all parties concerned, and the witnesses for all the parties used the measurements of the Survey as the basis of their testimony. These Survey reports contained not only factual information, but also certain tentative conclusions based thereon of the engineers for the Survey. The expert witnesses of the plaintiff, on many issues, differed radically from the Survey's engineers as to the conclusions to be drawn from the various measurements.

The projects of the defendant Pacific Gas and Electric Company, are upstream from the Pardee reservoir. About five or six miles upstream from the Pardee reservoir the Mokelumne River divides into three forks, called respectively the North Fork, Middle Fork and South Fork. The largest of these tributaries is the North Fork, and it is upon this stream that the several reservoirs, diverting canals and power projects of the Pacific Gas and Electric Company are located. It possesses certain "old" water rights and certain "new" water rights. It has a system of reservoirs and canals located on the North Fork and its tributaries by

means of which for many years it has supplied the towns of Jackson and Sutter Creek, and adjacent territory in the county of Amador, with water for municipal and domestic purposes. These towns are located outside the watershed of the Mokelumne River. The same reservoirs and works used for these purposes are also used to supply water for the Electra powerhouse located on the main Mokelumne River, a short distance upstream from the Pardee reservoir. The water used for power purposes is ultimately discharged back into the river. These "old" water rights were adequately defined by the trial court, and were found by it to be prior to any right of the City of Lodi. There is no controversy over these rights. It is the "new" water rights of this defendant that are in dispute. At the time of the commencement of this action this defendant was engaged in constructing a reservoir with a storage capacity of 130,000 acre-feet at Salt Springs on the North Fork, and in connection therewith various canals and powerhouses. Before the commencement of the trial of this action this project—the reservoir, canals and powerhouses—had been completed. The water impounded in the Salt Springs reservoir is used solely for power purposes, and is not conveyed outside the watershed. All the water stored in this reservoir, less evaporation and conduit losses, is returned by this defendant, after being used for power purposes, to the North Fork of the Mokelumne River above the City of Lodi. The storage and use of this water results in a regulated flow of the stream.

Pacific Gas and Electric Company, in addition, proposes to construct two additional reservoirs, one designated as the Lower Bear River reservoir with a storage capacity of 48,500 acre-feet, located on Bear Creek, a tributary of the North Fork, and the other designated as Deer Valley reservoir with a storage capacity of 9,412 acre-feet, located on Deer Creek, also a tributary of the North Fork. These two projects, when constructed, will be located upstream from the existing works of the Pacific Gas and Electric Company, and all waters impounded therein will be released back into the North Fork above Lodi, after having been used for power purposes.

This defendant has specifically renounced any claim and possesses no right to the water after it is discharged by it

back into the channel. The only water taken out of the stream and not returned above Lodi by this defendant is about 30 cubic feet per second required for distribution to Jackson, Sutter Creek and vicinity. This defendant possesses permits from the division of water rights and licenses from the federal power commission authorizing, subject to vested rights, the construction of all of the above projects and the appropriation of the disputed quantities of water for the above purposes.

Some reference should be made to the pleadings. The complaint, after describing the plaintiff's physical location, and the nature, value and requirements of its water system, alleges that the source of supply for the wells of the city is from a gravel and sand stratum alleged to be part of a large underground water-bearing formation underlying the Lodi area; that the sole source of supply for this underground area is the Mokelumne River; that the water percolates into this underground stratum from the river, particularly at the high flows; that for the five years immediately preceding the commencement of the action, due to a cycle of five dry years, and to increased pumping by other users in the Lodi area, the "water table has fallen materially in height"; that in some wells of the plaintiff the fall has been as much as ten feet; that if the water table continues to fall materially it will become impracticable to pump therefrom and the plaintiff will be without a water supply. After describing the District's and the Pacific Gas and Electric Company's various projects, it is alleged that the effect of impounding the high flows and regulating the stream flow and diverting away from the watershed a portion of the flow, will be to eliminate the beneficial effect of the normal flood flows in pressing water into the underground water supply; that the storage and diversion works of the defendants will adversely affect the height of the water table to the plaintiff's damage. In a second cause of action it is alleged that for over ten years preceding the commencement of the action the City of Lodi has been engaged in extracting water from its wells for domestic and municipal purposes, and has required a vested appropriative right to 6,000,000 gallons per day.

In its prayer the plaintiff asks: (1) that its title be quieted to the pleaded quantity of water as against the de-

fendants; (2) that the court find the extent to which the proposed operations of the defendants will affect the height of the water table in the Lodi area; (3) that the court enjoin the defendants from so storing or diverting the waters of the Mokelumne River as in any way to lower the height of the underground water table; and (4) for other and general relief.

The answer of the District denies that the water table underlying the City of Lodi has the Mokelumne River as its source of supply; admits the construction of the Pardee dam and diversion works; alleges that the District has the right to divert a portion of the flow of the Mokelumne River; that its right so to divert the flow is adverse to the plaintiff; that the flow of the Mokelumne River is highly variable and causes damages by floods; that a considerable portion of the waters of the river flows unused into the San Francisco Bay and is wasted; that the Pardee dam has an ultimate storage capacity of 220,000 acre-feet and is now storing 50,000 acre-feet; that the effect of the storage and diversions by the District will be to benefit the plaintiff and all lower owners in that it will reduce the flood hazards and regulate the flow; that prior to the filing of the complaint the District with the knowledge of the plaintiff has expended $60,000,000 on the Mokelumne project; that the property and rights of the District have been impressed with a public use and were so impressed prior to the filing of the complaint; denies that the effect of the District's operations will be to lower the water table; alleges that all the users of water below the Pardee dam, including the plaintiff, do not put to a beneficial use over 60,000 acre-feet, and that in a normal year over 800,000 acre-feet wastes into the sea; that the plaintiff will suffer no damage by the District's diversions. The answer also sets forth in detail the organization of the District, its need for water and the permits, both federal and state, under which it is operating, and the proportion of the work completed prior to the filing of the complaint, and the plaintiff's knowledge thereof. Based on these facts it is then alleged that under such circumstances the plaintiff is estopped from equitable relief and that the plaintiff should be relegated to an action at law for damages, the District being financially able to respond in damages if any shall result. The prayer of the answer asks: (1) that the plain-

tiff take nothing by its action; (2) that it be decreed that the claims of the plaintiff for equitable relief are barred because of acquiescence, laches and delay; (3) that the defendant's rights be quieted as against the plaintiff; (4) that the defendant recover its costs and have such other and further relief as may be meet in the premises.

The amended and supplemental answer of the defendant Pacific Gas and Electric Company, after admitting and describing in detail its various constructed and anticipated projects, and after admitting that such projects do and will interfere with the normal flow of the Mokelumne River, alleges that all waters impounded and to be impounded by its projects (except the quantity diverted for the use of Jackson, Sutter Creek and vicinity), are to be used by it for power purposes and will be substantially returned to the stream above Lodi in the same season that such waters are impounded, and denies that such impounding and consequent regulation of the flow of the stream will injure the plaintiff. This answer contains a detailed description of the various actual and prospective projects of this defendant, on the upper Mokelumne, sets forth its permits, state and federal, and describes in detail its method and proposed method of operation. In paragraph XIV of its answer this defendant sets forth an intricate and detailed schedule of operation. It is specifically alleged that the Pacific Gas and Electric Company proposes and intends to observe and comply with this proposed method of operation "for the purpose of avoiding unreasonable interference with the possession, exercise and enjoyment of the rights to the waters of the Mokelumne river possessed by lower riparian proprietors and appropriators". It is alleged that if the various projects of this defendant be operated according to the method of operation set forth in paragraph XIV the resulting regulation of the flow will not injure the plaintiff. By its prayer this defendant asks: (1) That the relief prayed for by the plaintiff be denied, and that the defendant recover its costs; (2) that the court ascertain and determine the respective rights and interests of the plaintiff and this defendant; (3) that such other and further relief as may be equitable be granted.

At the beginning of the trial plaintiff's counsel made what he terms "an offer to do equity". The plaintiff offered to accept in lieu of the injunction claimed by it the

construction by the defendants at their expense of five collapsible ponding dams to be constructed by the defendants over a period of years below the Pardee dam. It was the plaintiff's contention that these dams could be so operated as to maintain by artificial means the static head and percolation which the Mokelumne River had prior to its regulation by the defendants. The ultimate cost of this physical solution would be at least several hundreds of thousands of dollars. This offer was rejected by counsel for both defendants.

During the trial the District offered a proposed method of operation setting forth certain release schedules, referred to as the Grunsky schedule. In addition, during the course of the trial, the District offered to replace Lodi's water supply through the drilling of additional wells or by directly furnishing water to it from its conduit, subject to certain conditions, if and when the plaintiff could prove damage.

On the issues thus framed, and after a protracted trial and exhaustive study, the trial court provided in its decree that the method of operation proposed by the defendant Pacific Gas and Electric Company in its answer should be made mandatory upon it, and then provided for a detailed schedule of releases by the defendant District, regulated according to the stream flow of each year. According to the findings, conclusions and judgment, if the Pacific Gas and Electric Company operates according to its own plan of operation, and if the District makes the releases called for in the decree, the water table will be maintained at the level that would exist had the defendants not interfered with the flow of the Mokelumne River.

The court found that as the Mokelumne flows from the foothills toward the sea it loses a portion of its flow into and underneath its banks; that the underground percolating waters flow in a general southwesterly direction across the Lodi basin; that the quantity of water percolating into the underground strata of the Lodi area (found to be 34,000 acres), under natural conditions varies from year to year with the quantity and head of water flowing in the stream; that the temperature of the water affects the rate of percolation; that warm water percolates more rapidly than cold; that the maximum rate of percolation occurs when the flow is maintained between 400 and 600 second-feet; that under

natural conditions there percolates on the average into the strata underlying the 34,000 acres in the Lodi area about 50,000 acre-feet; that the normal high or flood flows perform a useful and beneficial function in flushing and washing the banks and bed of the stream, so as to remove vegetation, algae and salt therefrom; that the porosity of the bed and banks of the stream depends upon these normal high flows; that the percolating water basin has its apex near Clements where the Mokelumne debouches from the foothills and lies between Dry Creek, a stream roughly paralleling the Mokelumne about six miles to the north, and Bear Creek, a small stream roughly paralleling the Mokelumne about six miles to the south; that this large basin includes 70,000 acres; that of this over 34,000 acres immediately surrounding Lodi is the Lodi area; that the water from the Mokelumne percolates under this Lodi area; that the waters underlying the Lodi area are so interconnected that a draft on any part of the area or the withholding of water from any part of the area affects the height of the water table in the entire area; that the Mokelumne River furnishes the sole material source of replenishment to the underground waters of the basin; that the underground waters are utilized in the basin by means of over 2,000 wells driven into the underground strata; that the rainfall on the lands within the basin and the other streams running therein do not furnish a material source of underground water replenishment; that the annual draft on the underground water supply underlying the Lodi area by the plaintiff and other users is about 50,000 acre-feet; that during the 15 years immediately preceding the commencement of this action there has been an' increase in pumping in the Lodi area by the various overlying owners and that "the water table in said basin has been gradually falling"; that the water table has about come into balance; and there has been and now is a draft on the Mokelumne basin in the Lodi area equal to the average annual replenishment thereof, and there are no surplus waters in said Lodi area available for appropriation by others; that the balance now existing between the draft and the replenishment of the waters can only be maintained if there is no substantial interference with the percolation and underflow into the basin from the Mokelumne River; that the "plaintiff is entitled to have the water underneath its said well tracts

replenished from the Mokelumne river in such quantities as will maintain said appropriation and prescriptive right undiminished in quantity and undisturbed in quality, and that, subject to priorities hereinafter found to exist, such is its present right as against the defendants hereto and each of them, and as against all other persons.''

The court then describes in detail the Pacific Gas and Electric Company's proposed and actual diversions, and finds that the storage, release, diversion and use of the water of the Mokelumne by this defendant, if made substantially as proposed by that company in paragraph XIV of its additional defense, will not decrease the percolation from the Mokelumne River and will not cause any diminution whatever in such percolation or cause any injury to the plaintiff in any respect.

After describing in detail the defendant District's works and plans, the court found that the Grunsky release schedule was not sufficient to maintain percolation into the Lodi area as it would exist in a state of nature; that the effect of the District's past and proposed future operations has been and will be to cause a progressive decline in the water table in the Lodi area (assuming releases as set forth in the Grunsky schedule, and assuming the Pacific Gas and Electric Company makes its releases as it has agreed to), over and above replenishment ''of more than one foot per year on the average''; that the lowering of the water table will require the plaintiff to deepen its wells, and that the lower levels do not produce as potable a supply as the higher levels; that if the plaintiff attempts to substitute for its present wells, wells closer to the river, it will lose its present prior prescriptive right against others in the area; that in order to maintain percolation as it would exist in a state of nature, it is necessary to release the water according to various average daily rates of flow. In working out its comprehensive and complicated schedule of releases, the court made the amount released dependent upon the total flow for each calendar year which is to be estimated by various formulae set forth in full in the findings. The schedule starts with an estimated annual run-off of 250,000 acre-feet, and by nine different stages provides different schedules up to an annual estimated run-off of 800,000 acre-feet, or more. It is further provided that if the total run-off

be less than 120,000 acre-feet in any year, the entire flow of the river must be released by the District.

In addition to prescribing these compulsory average daily releases the court found that certain flushing releases were required to clear the channel of silt, algae and vegetation in order to keep the percolation rate as it would exist in a state of nature. By a carefuly worked out provision it is required that, depending upon conditions as they exist for ten days prior to certain fixed dates, the District must release these flushing flows. Thus if the total annual flow is estimated at not less than 450,000 acre-feet and not more than 500,000 acre-fect, and if within ten days of July 1st there has not been, at a designated point, a flow of 2,000 second-feet for 48 hours, then in the 48 hours of July 1st and 2d the District must release flushing flows sufficient to provide a 2,000 second-feet flow. The same provision is made for August 1st. For annual flows of between 500,000 and 600,000 acre-feet, three flushing flows of 2,000 second-feet for May 1st, July 1st and August 1st are provided, and if the flow is 600,000 acre-feet or more an additional flushing flow on April 1st must be had.

The amount of these mandatory releases is made dependent on the annual flow of the river, which is found to be highly variable. The court found that on January 1st of each year it is impossible to anticipate the total run-off for that year. The court worked out a detailed procedure for estimating the possible run-off in January, February and March of each year, and directed that the total flow for the following months be estimated in a prescribed fashion, and after July 1st the errors, if any, be compensated for.

The court also found that its schedule of releases may be maintained by the District without injury to it as far as its present diversions for domestic purposes (56,000 acre-feet) are concerned, even in the driest years, but that if the District in the future shall divert its ultimate right (224,000 acre-feet) for domestic purposes, and if there be a recurrence of the dry period comparable to that existing between 1924–1931, the compulsory schedule could not be carried out unless the District provide for additional storage in various possible reservoir sites now owned by the District. The court inferentially found that the compulsory release schedule will interfere with the District's appropriations for

power purposes. The court then made the appropriate findings to sustain its conclusion that the plaintiff had not been estopped by its actions from maintaining this action.

The summary of the findings indicates to some extent the exhaustive treatment given to the cause by the trial court, and the comprehensive nature of the relief granted to the plaintiff. A reading of the record indicates that the evidence produced by the parties, and particularly the expert evidence, was conflicting. No useful purpose would be served in recounting that evidence in this opinion. The trial court based its findings largely upon the expert evidence produced by the plaintiff. The District has filed exhaustive briefs purporting to analyze the evidence. Much of the argument contained therein is more fitted for an argument to the trial court than it is for a brief filed in a reviewing court, where the trial court's findings, supported by substantial evidence, are not subject to review. In the main the trial court's decree is grounded on the basic findings that the defendants' operations, if carried out as proposed by them, have damaged and will damage the plaintiff's prior water right, and that the schedule of releases fixed in its decree for each defendant is necessary in order to maintain the height of the water table as it existed before the two defendants interfered with the natural flow of the Mokelumne River. We are satisfied that the testimony, expert and lay, produced by the plaintiff is more than ample to support these basic findings. However, as will later appear, a retrial of this cause is necessary as to certain issues, because of the incorrect application by the trial court of the law to the facts. In view of such retrial we think it would be an unfair burden on the plaintiff to require it to prove again the facts upon which it predicates its action. These facts have been found by the trial court to exist and, being amply supported, should stand, without the necessity of a retrial thereof. Without specifying in particular, the many findings dealing with the following subjects should be held to be supported:

(1) That the plaintiff's right as fixed by the trial court, as an appropriator, is prior in time and right to that of the District to store any water, and prior in time and right to any claim of the defendant Pacific Gas and Electic Company

to store any water, except as to this defendant's "old" water rights as fixed by the trial court.

(2) That the Lodi area is as fixed by the trial court, and that the amount and rate of percolation from the Mokelumne River into the Lodi area is as fixed by the trial court.

(3) That the Mokelumne River furnishes the only substantial and reliable source of replenishment to the basin underlying the Lodi area.

(4) That the draft upon this underground basin, by the plaintiff and other users, is as found by the trial court.

(5) That, although for many years prior to the construction of the Pardee dam, the water table underlying the Lodi area had been falling, about the time of such construction the water table had come into balance between the normal draft thereon and the replenishment thereof.

(6) That the Pacific Gas and Electric Company's actual and contemplated storage, if carried out as this defendant has pleaded in paragraph XIV of its answer, and as it has stipulated it intended to do, will not materially affect, the plaintiff's rights; that although this defendant's operations will, by reason of its regulation of the flow of the North Fork, cut down the beneficent effects of the high flows on percolation, this factor will be compensated for by the fact that this defendant's proposed method of operations will maintain the summer flow at higher than normal levels.

(7) That the Grunsky schedule, proposed by the District, will not maintain the underground water plane; that the effect of the District's operations, if not regulated as provided by the trial court, has been to cause and will in the future continue to cause a progressive decline in the water table; that if the District operates as it proposes in the Grunsky schedule, its operations will cause an average annual drop of not less than one foot in the wells of the plaintiff; that as a result thereof the plaintiff will be compelled constantly to deepen its wells until they reach a point where they can no longer be economically operated.

(8) That the plaintiff has adequately proved damage so as to entitle it to some form of injunctive relief.

(9) That the plaintiff's prior water right is entitled to protection.

(10) That the schedule of releases as fixed by the trial court is necessary in order to maintain percolation as it

would exist without the defendant District's regulation of the flow of the stream.

(11) That the plaintiff is not estopped from maintaining this action for an injunction. This point will be discussed more fully hereafter in this opinion.

█ In considering the contentions made by the defendants other than the sufficiency of the evidence to support the findings, it is important to keep in mind the relatively simple issues involved in this case. The City of Lodi is an appropriator for municipal purposes from the underground waters supplied by the Mokelumne River, prior in time and right to any claim of the District, and prior in time and right to any claim of the Pacific Gas and Electric Company, except as to its "old" water rights, which are not in controversy. The District is a subsequent appropriator upstream from Lodi. Part of its proposed ultimate use is to consist in diverting from the Mokelumne River some 220,000 acre-feet annually out of the watershed for municipal purposes, and part of its proposed use is to consist in storage and regulation of the flow for power purposes, ultimately returning the water used for power purposes to the stream above Lodi. Both uses require impounding the waters of the stream and regulating ·the flow thereof. Both uses are beneficial uses, and if they can be carried out without substantial injury to prior vested rights should be permitted without unreasonable restrictions. █ The Pacific Gas and Electric Company desires to engage in seasonal storage for power purposes. Although this defendant is a large riparian owner on the stream, its proposed method of use does not constitute a proper riparian use but constitutes an appropriation. Seasonal storage of water for power purposes is not a proper riparian use, but constitutes an appropriation. (*Colorado P. Co.* v. *Pacific Gas & Electric Co.*, 218 Cal. 559 [24 Pac. (2d) 495], involving some of the storage projects involved in the present case; *Seneca C. G. M. Co.* v. *Great Western Power Co.*, 209 Cal. 206 [287 Pac. 93, 70 A. L. R. 210].) It desires to impound the water and to store the same for power purposes, and, except as to its "old" water rights, will return the water so impounded to the stream upstream from Lodi. Its plans necessarily. require a regulation of the normal flow of the North Fork of the Mokelumne River.

The questions involved in this action may therefore be reduced to the following:

(1) Is the Mokelumne River the sole substantial source of supply for the plaintiff's wells?

(2) If so, do the operations of the defendants adversely and substantially affect that supply? and

(3) If so, what sort of regulation should be imposed on the defendants to protect the plaintiff's prior right?

The trial court, as already indicated, and quite properly, answered the first two questions in the affirmative. In solving the third, the trial court took the view that the only legal solution, in the absence of agreement between the parties as to a physical solution, was to work out a system of operation for the defendants, and enforce it by injunction, so that normal percolation would be maintained. The trial court thereupon worked out its comprehensive and compulsory schedule of releases set forth in the decree. By this schedule the District is compelled to release from its reservoir average daily flows in the minimum annual amount of 120,000 acre-feet and a maximum annual amount of more than 360,000 acre-feet. In other words, in order that the plaintiff may continue to pump its 3,600 acre-feet annually from its wells, the District is compelled to release from 120,000 to 360,000 acre-feet annually, the court finding that such releases were necessary to force Lodi's water into the underground basin. The theory of the trial court was that such compulsory releases were indispensable to maintain conditions approximating those existing if the flow of the stream had not been interfered with. Even under the Grunsky schedule, proposed by the District and which the trial court found insufficient, a minimum annual release of 82,800 acre-feet was guaranteed, and when the flow exceeds 500,000 acre-feet (according to past records this would be in four out of every five years), the District agreed to release not less than 200,000 acre-feet. In a normal year, when the flow is over 800,000 acre-feet, and when the District is taking its full ultimate diversion of 224,000 acre-feet, over 580,000 acre-feet under the Grunsky schedule would remain in the stream. At the present time the District is diverting but .56,000 acre-feet, and it will be many years, no doubt, before the District will divert its ultimate quantity. At the present

time, in a normal year, over 750,000 acre-feet will flow past Lodi to supply its prior right to 3,600 feet.

It may be noted here that the City of Lodi is the sole plaintiff. There are many other landowners, overlying and riparian, who use water in the Lodi area. The record discloses that some 300 of these owners have actions pending against the District. The rights of these and other owners are not involved in this action.

The mere statement of the essential provisions of the decree entailing the huge releases enumerated, with the tremendous waste entailed, is sufficient to cast grave doubt on its propriety. Although the trial court did not directly so find, in reaching its conclusions and in framing its decree, it must have considered not only the needs of the plaintiff, but also the needs and requirements of all the other users in the Lodi area, found by it to constitute some 34,000 acres. That this was error of a most serious nature is clear. The District may find it necessary to condemn or otherwise acquire the water rights of the private riparian and overlying owners in this area. But, if the District should so acquire every private water right in the area it would still be compelled under the decree to release the tremendous quantities of water above mentioned to protect the plaintiff's prior right.

It may be assumed that before the adoption of the constitutional amendment in 1928 to article XIV, section 3, it was the law of this state that under basic findings, such as are enumerated above, the prior appropriator was entitled to an injunction so fixing releases by the subsequent appropriator as to substantially maintain the water table as it would have existed if the subsequent appropriator had not come upon the stream, if to lower the water table would materially injure the prior appropriator. It may also be assumed that it was the law prior to 1928 that the prior appropriator could not be compelled to accept in lieu of his vested prior property right a physical solution, other than the actual maintenance of the water table. (*Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772]; see, also, *Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391]; *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607].) The decree entered in the present

case may be said to be a proper decree under the law as enunciated in the Miller case. We have no doubt that in the present case the trial court framed its decree in accordance with the law as enunciated in the cited cases.

But *Miller* v. *Bay Cities Water Co., supra,* in so far as it held that the full flow of a stream may be used to force a relatively small quantity of water into adjoining underground basins, and that a prior appropriator is entitled to an injunction to maintain this natural condition even where the prior appropriator's right may be fully protected by the use of a much smaller quantity of water, is no longer the law of this state. In *Peabody* v. *City of Vallejo,* 2 Cal. (2d) 351 [40 Pac. (2d) 486], after discussing the major changes in the water law of this state made necessary by the 1928 constitutional amendment, and after pointing out the theory and effect of that amendment on riparian rights, and after pointing out that overlying owners or appropriators, under the theory of *Katz* v. *Walkinshaw,* 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236], possess rights analogous to those possessed by riparian owners, and after discussing at length the rules of law set forth in *Miller* v. *Bay Cities Water Co., supra,* this court stated:

"Notwithstanding the common-law rule to the contrary, this court, in the cases referred to, accorded to the underlying and percolating water right a status analogous to the riparian right. The attitude of some of the plaintiffs herein in effect is that, possessing that status, they are entitled to have the underground waters flow and percolate as in a state of nature regardless of the quantity of the supply or the reasonableness of use. But since the riparian right as against an appropriator has by the new state policy been subjected to the doctrine of reasonable use, no good reason has been advanced why the asserted underground and percolating water right should not be subjected to the same regulation as against an appropriator. In whatever respects the Miller case, or any other case, may be said to hold otherwise, they must be deemed to yield to the new constitutional policy with reference to the use of the waters of the state." For other discussions of the effect of the 1928 constitutional amendment see *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673 [22 Pac. (2d) 5]; *Tulare Irr. Dist.*

v. *Lindsay-Strathmore Irr. Dist.,* 3 Cal. (2d) 489 [45 Pac. (2d) 972]. It should be noted that the decision of the trial court in the present case, although rendered after the adoption of the 1928 constitutional amendment, was rendered before this court finally decided the Peabody case.

We are now called upon to determine what the correlative rights of prior and subsequent appropriators are under the 1928 constitutional amendment, under facts as are here disclosed. The problem presented in this case is somewhat different from that involved in the Peabody case. In that case there was no evidence of material damage to the overlying owners traceable to the impounding of a portion of the flow. In the present case under the findings already held to be supported, it appears that the defendant District's method of proposed operation will, over a period of years, lower the water table to the material injury of Lodi. Moreover, it appears that under existing conditions Lodi's method of diversion is reasonable, and that the use to which the water is put is a reasonable beneficial use. If natural conditions are to be maintained artificially, the method of operation as fixed by the trial court must be enforced. The mere fact, so often emphasized by the District, that Lodi's right is small as compared either with the District's wants or the flow of the stream, in no way detracts from that right, which is entitled to both legal and equitable protection. (*Peabody* v. *City of Vallejo, supra,* p. 374.) The District is a subsequent appropriator, and the duty rests upon it, after the plaintiff has proved the extent of its right, to prove the existence of a surplus. (*Peabody* v. *City of Vallejo, supra,* p. 381; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* p. 535.) The question is, can the right of the city be fully protected without requiring the tremendous releases entailed in this decree? Those releases, after they serve the purpose of forcing a relatively small quantity of water into the surrounding underground water table, for the most part, waste into the sea. Under such circumstances the 1928 constitutional amendment, as applied by this court in the cases cited, compels the trial court, before issuing a decree entailing such waste of water, to ascertain whether there exists a physical solution of the problem presented that will avoid the waste, and that will at the same time not unreasonably

and adversely affect the prior appropriator's vested property right. In attempting to work out such a solution the policy which is now part of the fundamental law of the state must be adhered to. It is declared in section 3 of article XIV of the Constitution:

"It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare . . . "

█ In the present case the parties suggested certain solutions which were not acceptable to their opponents. Lodi stipulated that it would accept the construction of certain ponding dams to maintain artificially the underground levels. The District, subject to certain qualifications, suggested the drilling of new wells by Lodi, if necessary at the District's expense, nearer the river on new well tracts to be purchased by the city. This obviously would be to substitute a new, different and inferior right for that now possessed by the city. It is quite clear that if the city were now to attempt to pump its 3,600 acre-feet from wells located on the river bank, such pumping might adversely affect the rights of property owners whose wells are now located closer to the river than are Lodi's, and as a result this solution would result in litigation. While it is undoubtedly the law that an appropriator may change the place of his diversion when the rights of others are not adversely affected thereby (*Barton* v. *Riverside Water Co.*, 155 Cal. 509 [101 Pac. 790, 23 L. R. A. (N. S.) 331]; *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7 [198 Pac. 784]), the law is equally clear that the place of diversion cannot be changed to an entirely different tract when to do so will adversely affect the rights of intervening owners. The cases cited that establish the right to change the place of diversion equally establish the limitations on that right. This physical solution does not now appear to be adequate.

The District also offered, subject to various qualifications, in case of shortage, to supply the City of Lodi with water from its pipe line located a few miles from the city. Lodi objected to the solution on the ground that the District has no power to supply any municipality with water other than those included within the boundaries of the District. This objection is without merit. Whatever limitations there may be on the District's power to supply other than certain enumerated areas with water it is clear that if in order to operate its project at all, water must be furnished to a prior claimant, the District possesses the implied power so to furnish the water. Other suggestions as to possible physical solutions were made during the trial. The trial court apparently took the view that none of them could be enforced by it unless the interested parties both agreed thereto. That is not the law. Since the adoption of the 1928 constitutional amendment, it is not only within the power but it is also the duty of the trial court to admit evidence relating to possible physical solutions, and if none is satisfactory to it to suggest on its own motion such physical solution. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* p. 574.) The court possesses the power to enforce such solution regardless of whether the parties agree. If the trial court desires competent expert evidence on this or any other problem connected with the case, it possesses the power to refer the matter to the division of water rights of the board of public works, or to appoint it as an expert. (*Peabody* v. *City of Vallejo, supra,* p. 373; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* p. 575.) If a physical solution is to be worked out which would require the city to change its method of appropriation, any substantial expense incidental thereto should be borne by the District. The city is a prior appropriator and as such cannot be compelled to incur any material expense in order to accommodate the subsequent appropriator. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* p. 574.) Although the prior appropriator may be required to make minor changes in its method of appropriation in order to render available water for subsequent appropriators, it cannot be compelled to make major changes or to incur substantial expense. (*Peabody* v. *City of Vallejo, supra,* p. 376.)

With the foregoing considerations and principles in mind we now turn to a discussion of how they should be applied to the present case. We have here a city whose prior right is 3,600 acre-feet annually. The city is at present securing this quantity by wells sunk into the underground water table supplied from the Mokelumne. The city's method of diversion appears to be reasonable, and the use to which the water is put is a reasonable beneficial one. We have a river with a normal flow of in excess of 800,000 acre-feet and a minimum flow of over 200,000 acre-feet. The District desires ultimately to divert 220,000 acre-feet out of the watershed for municipal and domestic purposes. There is adequate water available to supply the city's right and to supply the District's ultimate needs, except in the very driest years. In this connection certain other factors should be mentioned. The evidence shows that prior to judgment the city's wells, instead of being lowered by the defendant District's operations had in fact slightly risen. The city claims that this was due to two causes which are not permanent: One, that the District prior to and during the trial, by the use of its huge storage of 220,000 acre-feet, of which but 56,000 acre-feet are now needed annually to supply its needs, regulated the flow of the stream in such a manner as artificially to increase percolation far in excess of what would occur under normal operations of the District. The trial court undoubtedly considered the conditions thus created as temporary, and on substantial evidence found that serious damage would result from the District's proposed permanent method of operation. This is sufficient to warrant injunctive relief. (Sec. 526, Code Civ. Proc., see, also, *Worthen & Aldrich* v. *White Spring Paper Co.,* 74 N. J. Eq. 647 [70 Atl. 468]; *Beach* v. *Sterling Iron & Zink Co.,* 54 N. J. Eq. 65 [33 Atl. 286]; *Trade Dollar Con. Min. Co.* v. *Fraser,* 148 Fed. 585.) However, the fact that there is no immediate danger to the City of Lodi's water right is an element to be considered in working out a proper solution.

The second factor tending to increase percolation immediately before and during the trial over normal conditions was the acts of the Woodbridge Irrigation District. It impounds a portion of the flow of the river by means of removable flashboards, thus artificially creating a lake

a short distance downstream from Lodi. Since the building of the Pardee dam and the consequent regulation of the flow of the stream by the District, the Woodbridge Irrigation District has been able, because the regulated flow increases the normally low summer flows, to maintain its flashboards in place for much longer periods, and as a result to maintain the lake for a much longer time than it could or did under normal conditions. A large part of this impounded water is spread on the ground by the landowners in this irrigation district for irrigation purposes, thus tending to maintain or add to the underground supplies. Both the city and the defendant District concede that the irrigators of the Woodbridge Irrigation District are using excessive quantities of water, and if their present methods are continued a real drainage problem will be created in that area. There is at present litigation pending between the irrigation district and the defendant District over the extent of the irrigation district's priority.

However, whatever the reasons may be, the record conclusively establishes the fact that the plaintiff's water supply had not been materially diminished between the time the District commenced operations and the time judgment was entered herein. One of the expert witnesses called by the plaintiff conceded that its wells could go down at least twenty-five feet below their present levels without danger or substantial injury to the plaintiff. Assuming a lowering of one foot a year by the District's operations, as found by the trial court, it is apparent that the plaintiff's water supply is in no immediate danger. What, then, should the trial court have done or now do in such circumstances? Under the present law of the state, in accomplishing the necessary and beneficent purpose of the 1928 constitutional amendment, the trial court should attempt to cause its decree to protect fully the prior appropriator's rights, and at the same time should so frame its decree as to prevent an unreasonable waste of the waters of the stream. A consideration of the facts in this case and as above outlined leads to the inevitable conclusion that the decree entered herein would result in an unjustifiable and unreasonable waste which should be avoided if a practical physical solution may be found. The question then is, what solution is available under the facts here presented?

In our opinion the cause should be sent back to the trial court to permit it to take evidence as to the levels, to which plaintiff's wells may be lowered without substantial danger to the city's water supply. In fixing this danger level an adequate safety factor in favor of the city should be allowed. There is no necessity for a retrial of the case on the issues of fact as to which the court has made extensive findings, as above noted. The facts as thus found may be considered in connection with the further evidence taken to fix the danger level of Lodi's wells. The decree should then be reframed to provide that the duty rests upon the District to maintain the levels of the plaintiff's wells above the danger level so fixed by the trial court; that in the event the levels of the wells reach the danger points, the duty be cast upon the District to supply water to the city, or to raise the levels of the wells above the danger mark; and if the District does not comply with this order within a reasonable time, then the injunction decree already framed, or upon a proper showing as modified by the court under its continuing jurisdiction, shall go into effect. The trial court should by its judgment preserve its continuing jurisdiction, to change or modify its orders and decree as occasion may require.

Such a decree would adequately meet the requirements of the Constitution by preventing an unreasonable waste of the waters of the stream and at the same time would adequately protect the prior rights of the City of Lodi. It would afford to the city a continuance of its water supply, the same, for all practical purposes, as if natural conditions were required to persist. If its wells go down to the danger level, it would immediately obtain water from the District at the latter's expense, or the injunction decree by means of which the underground levels will be artificially maintained would go into effect. It would accord to the District the right and place upon it the duty of working out a physical solution unhampered by a rigid decree which, with changing conditions and new methods of conservation constantly being developed, may not only operate inequitably but might actually encourage waste. It would place upon the District the duty at its expense to maintain the underground water levels, and if the District fails to do so, or fails to supply water directly to the City of Lodi, the decree

provides for compulsory releases so as to maintain natural conditions. Such a decree would say to the District: You should maintain the water levels so as not to cause substantial damage to the city, and you may do this in any way best suited to your needs, or if you do not maintain those levels you should supplement the city's supply to the extent of the deficiency caused by your operations by the furnishing of water by artificial means and at your expense. If you do not do these things you are subject to an injunction compelling releases to maintain natural conditions. Such a decree would undoubtedly prevent a multiplicity of suits. It would fix the rights of the prior appropriator and would determine the effect of the subsequent appropriator's diversions. Since there is no immediate danger to the prior appropriator, it would fix the danger levels of the prior appropriator's wells and when that level is reached, upon a showing to that effect, it would require the subsequent appropriator either by direct delivery of water or by compulsory releases to supply the prior appropriator's needs.

Such a decree would permit the full use of all available waters, guarantee to the prior appropriator full protection, and would do this without unduly restraining the operations of the subsequent appropriator.

It is obvious from what already has been said that, although the decree must be reversed as far as the District is concerned, the retrial will be confined to the taking of evidence. as to the danger level of the plaintiff's wells, allowing as indicated a definite safety factor. Upon the findings made thereon the trial court should then modify its decree accordingly.

We are not impressed by the District's contention that a public use in its favor has intervened as against the City of Lodi, and that the latter is therefore limited to money damages. The city is a governmental agency, and although an estoppel may in a proper case be applied against a governmental agency (*Times-Mirror Co.* v. *Superior Court*, 3 Cal. (2d) 309 [44 Pac. (2d) 547]; *McGee* v. *City of Los Angeles*, 6 Cal. (2d) 390 [57 Pac. (2d) 925]), such rule, particularly where its effect would be to deprive a municipality of its municipal water supply, should be applied only in the clearest case, if at all. Here the record discloses that when the District first made application for its permits, the

city filed a protest with the water commission. Suit was not filed until December 1928, but it appears that in the interim the agents of the District constantly represented that the underground water levels would be raised rather than lowered by the District's operations. Such representations were of such a nature as to excuse the city in not bringing the action sooner. Under the circumstances the doctrine of intervention of a public use has no application to the City of Lodi.

We find no error in the trial court's refusal to reopen the case after judgment rendered. The proffered evidence, on the whole, was mainly cumulative.

As to the appeal of the defendant Pacific Gas and Electric Company little need be said. As already pointed out this defendant pleaded as a defense in its answer a proposed method of operation which it claimed and the trial court found would, if abided by, not injure the plaintiff. At the commencement of the trial it offered to stipulate that a decree could be entered making its proposed release schedule binding upon it. As to this defendant the trial court fixed its schedule of releases substantially in accordance with the pleaded method of operation. This defendant now seeks to be released from the legal effect of its pleaded defense and offer. It contends that since its offer to operate in accordance with its pleaded defense was not accepted at the commencement of the trial it must be deemed to have been withdrawn. We are not convinced by such an argument. An examination of the record demonstrates that the entire cause was tried on the theory that this defendant would operate in accordance with its pleaded method of operation.

The contention of this defendant that the trial court found that its operations would not damage the city, and therefore no injunction should have issued cannot be sustained. The finding in question is to the effect that if this defendant operates in accordance with its proposed method of operation then no damage would result to the City of Lodi. Obviously the city is entitled to an injunction to compel this defendant to operate as it pleaded it would do.

This defendant also objects to the decree in that the trial court retained jurisdiction solely to enforce the

decree. We think the trial court should retain jurisdiction over the decree not only to enforce it, but to permit changes therein as experience under the decree may show to be necessary. If conditions as they develop indicate that the proposed schedule of operations of this defendant are too restrictive or are unfair and without real benefit to the plaintiff, the court should retain jurisdiction to modify its decree as occasion may require. In view of the reversal as to the other defendant, the decree as to this defendant will be reversed for the sole purpose of permitting the decree thus to be modified.

The judgment is reversed and the cause remanded for the purpose of permitting the trial court to proceed in accordance with the views herein expressed, and as herein limited. All parties to bear their own costs on this appeal.

Waste, C. J., Curtis, J., Seawell, J., and Thompson, J., concurred.

Rehearing denied.