[L. A. No. 18809. In Bank. Dec. 19, 1946.]

MARVIN L. ALLEN et al., Plaintiffs and Respondents, v. CALIFORNIA WATER AND TELEPHONE COM-PANY (a Corporation), Appellant; GEORGE AHL-BORN et al., Cross-defendants and Respondents.

Bacigalupi, Elkus & Salinger, Philip Storer Thacher and Charles DeY. Elkus for Appellant.

Robert W. Kenny, Attorney General, Spencer Burroughs, C. C. Carleton and Henry Holsinger, Deputies Attorney General, as Amici Curiae on behalf of Appellant.

J. F. DuPaul, City Attorney, and Shelley J. Higgins for Respondents, City of San Diego.

Phil D. Swing and Charles C. Crouch for Respondents.

A. L. Cowell, Ronald B. Harris, Harry W. Horton, W. H. Jennings, C. F. Metteer and Maurice M. Myers as Amici Curiae on behalf of Respondents.

SHENK, J.—This is an appeal from a judgment which declares plaintiffs' paramount rights, as overlying owners, to the underground waters of the Tia Juana River Basin, and restrains defendant in the exercise of its subordinate appropriative right to pump and export water to points without the watershed.

The main ground urged for reversal is that the trial court erred in concluding that there are in the basin no surplus waters available for exportation by defendant over and above the supply required to satisfy the reasonable, beneficial needs of riparian and overlying owners. It is also contended that because of the difficult and complex problems presented and the technical aspects of the case, the trial court should have acceded to defendant's repeated requests for the assistance of the Division of Water Resources.

The following rough chart will aid an understanding of the facts:

The Tia Juana River rises in the Republic of Mexico, whence it flows some 60 miles northwesterly, crossing the International Boundary, and emptying into the Pacific Ocean. Except for easterly areas in the United States drained by the Arroyo Seco and Cottonwood Creek, and not here involved, the watershed of the river is entirely in Mexico. All tributaries join the main stream before it reaches the United States. The distance from the point of crossing the International Boundary to the river's mouth is about six miles. The waters here in controversy are those contained in the natural basin which underlies these last few miles of stream flow in the United States.

Like most Southern California streams, the Tia Juana River has an intermittent and variable flow, not only from month to month and season to season, but from year to year. Although records have been kept for relatively few years, it is established that successive years of deficient rainfall, with practically no water running in the river bed in the United States, have been followed by a year or successive years of normal and also by excessive rainfall in which the valley has been swept by disastrous floods.

Various dams restraining tributary and main streams have been erected in the United States and in Mexico, greatly reducing the uncontrolled drainage area, and affecting the volume of main flow by reason of releases during period of high water, leakage, percolation, and return water from irrigation. The Rodriguez Dam in Mexico is located about twelve miles upstream from the International Boundary and upstream from the junction of Cottonwood Creek with the Tia Juana River, so that the waters impounded originate almost entirely in Mexico. It has a storage capacity of 110,000 acre feet or more. It was completed in 1936, and the only water flowing over its spillway was released during the heavy rainfall of 1940-1941. About two years after the dam began to function a return flow developed from the Mexican irrigation project below the dam site, and a serious leak appeared in one of the rock canyon walls, permitting the escape and return to the main stream of considerable water. The volume of this leakage is a subject of uncertainty, as is also the volume of return flow, but for purposes of this discussion the former may be estimated at a minimum of about 2,500 acre feet per annum, and the latter at 2,000 acre feet per annum. There has thus been produced a controlled water supply to the river of an estimated 4,500 acre feet per annum. The factors affecting the dependability and continuance of this supply will be hereinafter discussed.

The river basin formation starts at a point not far south of the International Boundary and broadens into a valley that passes through Mexican territory, thence into the United States, and thence in a general northwesterly direction for about six miles, terminating at the Pacific Ocean. It is an alluvial fill from one to one and a half miles wide, bounded on the north and south by mesas rising above the valley floor.

Plaintiffs are the owners of lands overlying that portion

of the underground basin in the United States, and they obtain water by pumping from individual wells located throughout the valley. The lands are devoted largely to agricultural, orchard, vineyard, and residence use. Defendant company, the successor of Coronado Water Company, also owns lands and wells in the valley. In June, 1936, plaintiffs filed their original, and in December, 1939, their final amended and supplemental complaint herein. They alleged their paramount right to waters of the basin for reasonable, beneficial needs, and charged that defendant was engaged in the construction of a large pipe line to convey water pumped from the basin to points without the watershed. They asserted that after removal of the large quantity of water which defendant proposed to export, there would not remain in the basin a sufficient supply for their use, and that the underground water level would be so lowered that the water in their wells would become salty, alkaline, brackish, and unfit for either domestic or agricultural use. They prayed for a declaration of their paramount right; that defendant be enjoined from asserting any interest adverse thereto, and from exporting water to points without the watershed; for such further relief as might be meet and equitable; and for costs.

Defendant answered setting up permits issued in 1924 and 1932 by the Division of Water Rights or its successor, the Division of Water Resources, allowing it to export, subject to prior rights, 3,200 acre feet of water annually, and asserting that such removal could be effected without undue drain upon or damage to plaintiffs' supply. Defendant also filed a cross-complaint against plaintiffs and, presumably, all other riparian and appropriative owners of waters of the basin and the holders of liens on many of the riparian lands, seeking not only a determination of the interests of the various cross-defendants, but also to have the trial court make reasonable regulations for the use of the waters with retention of jurisdiction to modify its decree as occasion might demand, and other meet and equitable relief.

Trial of the cause was commenced in November, 1940, and consumed a period of five months. Expert witnesses were called by both sides and most of the evidence was of a highly technical nature, requiring specialized knowledge in various fields of study for complete comprehension. Crop and soil surveys, and the character, acreage, and type of use of each parcel of land in the valley were analyzed. Well log data,

information relative to pumping methods, and costs, and the effect on the underground supply, as well as opinions on the quantity, quality and mineral content of water in various portions of the valley were received in evidence. Reports were submitted bearing upon the character of the underground formation, its relative permeability, its capacity as a storage reservoir, the direction, quantity, and rate of the underground flow, and factors relative to the danger of salt water intrusion. The effect of the upstream dam construction and of the past, present, and possible future methods of use of the water in Mexico were also considered.

Confronted with a mass of technical and conflicting evidence, the court took the case under submission at the close of the trial in April, 1941. A supplemental hearing was had in January, 1942, at which evidence was received of another year's record of conditions in the Tia Juana Valley. In June, 1942, the court filed an exhaustive memorandum opinion; in November, 1942, it denied a motion for reference to the Division of Water Resources, but received some additional evidence; and in December, 1942, findings of fact, conclusions of law and judgment were filed.

Among other things the court found the amount of acreage owned by the individual plaintiffs and appearing cross-defendants, and the amount of water reasonably required for present and possible future beneficial use for each parcel of overlying land. It found that there were not more than 21,000 acre feet of water then in the sands of the basin, available for economic use; that without storage of some part of the surface flow which wastes into the ocean, the annual safe net yield of the river and the basin within the boundaries of the United States is less than 6,000 acre feet per annum; that "at the present time at least 7000 acre feet of water per annum consumptive use are necessary for the reasonable and beneficial purposes of all lands having a right to the use of such water, and that in the future at least 7500 acre feet per annum, consumptive use will be so required."

The court found that the full safe net yield of water is required for reasonable, beneficial use on overlying lands and that after application of the waters of the basin to satisfy the individual needs under paramount rights, there remains no safe or dependable surplus available for exportation; that the only water not reasonably required under paramount rights for overlying lands is that part of the surface flow which

reaches the ocean, or would reach it if not diverted by defendant; that if defendant were allowed indefinitely to continue pumping, the water level in the individual wells would be lowered unreasonably and the owners would have a substantial increase in their pumping costs; that defendant's pumping so far has not increased the salinity of the water, and there has been no substantial intrusion of sea water; but that there are physical factors showing that pumping by defendant in periods of drought would materially increase the salt water hazard.

The court found that a physical solution proposed by defendant was unworkable, and also that the long established practice in the valley of obtaining water by the operation of individual wells is increasingly unsatisfactory and not conducive to putting to beneficial use to the fullest extent the resources of the basin; that to use the surface and underground flows to the fullest extent of which they are capable requires nothing less than a unified control of the entire water supply of the region, either by some public agency or some private agency operating as a public utility, and an abandonment of the present system of pumping, together with the substitution of a relatively few pumping plants controlled by a unified agency and a comprehensive distributing system; also a system of artificial storage whereby in flood seasons water in excess of the storage capacity of the valley fill may be impounded for use in drier years; that pending the accomplishment of unified control, the present system of individual ownership and pumping is the only feasible manner of maintaining the population and continued use of the lands for residential and agricultural purposes. Under a unified control and distribution, the court found, there would be, except in years of subnormal runoff, excess water over and above the amounts necessary to satisfy rights paramount to defendant's right to export.

The judgment declares the extent of the paramount right of plaintiffs and appearing cross-defendants to water for their respective parcels of land, and also the extent of defendant's riparian right. As to defendant's appropriative right, it decrees that defendant is not entitled to take any water from the basin for exportation, except such water as is not reasonably required by those having paramount rights, the amount which defendant may export being fixed at 1100 acre feet for the year 1942, 1100 acre feet for 1943, and 550

acre feet for 1944, with not more than 1.53 million gallons being diverted in any one day. It is provided that after December 31, 1944, except in the event of modification of the judgment upon application made prior to that date, defendant shall not divert or export any water whatever from the underground basin, but that defendant is and shall be entitled to divert and export any surface flow of the river which would otherwise waste into the ocean.

Defendant appealed from this decree and moved for a new trial. In January, 1943, the motion for new trial was denied and in December, 1943, a motion for modification of the judgment was likewise denied and defendant appealed separately from the order of denial (see *Allen* v. *California Water & Tel. Co., post,* p. 878 [176 P.2d 24], this day decided). On the present appeal from the decree defendant challenges the sufficiency of the evidence to support many of the findings, particularly those bearing upon the net safe yield of the basin and the non-existence of surplus water for exportation. Complaint is also made of the granting of injunctive relief; numerous incidental points are argued; the necessity for a physical solution is stressed; and complaint is made of the trial court's refusal to order a reference to the Division of Water Resources.

Among the many factors to be considered in computing the net safe yield of the basin are available sources of supply, dependability of annual replenishment, storage capacity of the underground reservoir, extent to which the water table may safely be lowered, danger of salt water intrusion, and the like. On these subjects the plaintiffs' witnesses drew conclusions from the physical facts different from those of the defendant's witnesses.

The variable character of the annual supply from rainfall and other natural sources, due to intermittent periods of drought, normality, and over-abundance, and the absence of records for more than relatively few years, has already been mentioned, as has also the development in late years of a flow resulting from the Mexican Rodriguez project. The surface flow at a point about two and one-half miles from the ocean, for the years in which any accurate records are available, has varied from none or one or two months of runoff, and from no surface flow or only 300 to 400 acre feet, to years with as high as four or five months of runoff and a surface flow of 240,000 to 250,000 acre feet. In the record 1940-1941 season

there were ten months of runoff, with a flow of 334,849 acre feet.

In estimating the dependable annual yield of ground water from the valley in the United States, plaintiffs' expert witness, Charles H. Lee, considered the necessity of retaining sufficient water in the basin to tide over a reasonably anticipated period of three successive years of drought without replenishment from natural sources, and fixed the estimated dependable yield at less than 4,000 acre feet per annum. Defendant's expert witness, Edward R. Bowen, expressed the view that it is unwise to use a period of three successive years of no replenishment whatsoever as a criterion upon which to limit the use of a water supply because this results in a waste of water in years of normal or abundant replenishment. He concluded that defendant could divert 3,200 acre feet seasonally of ground water without unreasonably lowering the water table or endangering the supply for overlying lands. The trial court found the estimated net safe yield to be less than 6,000 acre feet per annum.

The question arose whether the estimated increment of 4,500 acre feet per annum from the Mexican project should be considered as a safe, established, and dependable source of annual replenishment of that portion of the basin in the United States. The trial court refused to consider this supply as dependable for two reasons: First, it concluded that the construction in Mexico was of such recent origin that the annual future yield could not be safely estimated with sufficient certainty to form the basis of a judgment permitting the future removal from the basin of water finding its origin in that source. What the effect of a series of dry years and the lowering of the level of water behind the Rodriguez Dam would have on the leakage through the canyon wall could not be determined from any past experience. A lowering of the water level behind the dam, reducing the water pressure against the canyon wall, might result in decreased leakage. Second, the waters, before crossing the International Boundary, are entirely within the Republic of Mexico, which, in the absence of a treaty, may reclaim them or prevent their entry into this country. Of course, the latter reason may as soundly be applied to the status of all waters in the main stream crossing the International Boundary, for in the absence of treaty all are equally subject to interruption and appropriation in entirety in Mexico. Thus doubt is cast upon

the dependability and continuance of the full flow across the border, regardless of whether it represents augmentation by the Rodriguez project, and sound argument is presented for retention of jurisdiction in the trial court for further action as occasion may require.

The underground basin was originally formed by erosion, and gradually filled with gravel, boulders, silt, clay, sand, and less permeable materials in the mesas bordering the two sides. The surface of the valley fill slopes westerly from the International Boundary to the sea, with the westerly limits broken by salt water sloughs. The underground formations vary in permeability, in absorptive quality, and in their ability to yield water. Various theories were expounded by the expert witnesses in explaining the bases for their respective estimates of the storage capacity of the underground reservoir, and the danger of salt water intrusion through any lowering of the water level.

In estimating storage capacity, Mr. Bowen considered a depth of from 40 feet minimum to 135 feet maximum, not including the upper five feet, and applied a specific yield of 20 per cent to the total estimated volume of 251,300 acre feet of effective valley fill in the United States and Mexico. He thus estimated a water storage capacity of 50,260 acre feet, of which 43,260 acre feet are in the United States. Mr. Lee, on the other hand, explained that parts of the valley fill are not available for storage and extraction of water. He considered available storage to include only an average depth of 45 feet, being the distance from the water table level at maximum height, except flood, to the lowest point from which water might be extracted as a practical matter of operation. He estimated the net available storage capacity of the upper basin, without deduction against salt water intrusion, at 15,980 acre feet, and of the lower basin at 2,840 acre feet. To this combined net storage capacity he added the capacity of mesa formation buried beneath a thin sheet of modern alluvium, and reached a total of 20,620 acre feet.

Although the reservoir was likened to an underground lake, Mr. Lee described it as more like two underground basins separated by a constriction near the site of defendant's pumping plant formed by buried projections into the valley of the relatively impermeable mesa formation. The normal percolation of water in the basin is westerly toward

the ocean but there is also lateral percolation from the margins, and the possibility under certain conditions of a reversal of flow. Mr. Lee stated his belief that the gravel strata extends to within a quarter of a mile of the ocean and that this strata, in which the wells terminate, is a continuous sheet, so that pumping at one point affects the pressure at other points. One of his conclusions is that pumping creates a cone of pressure depression in the gravel strata, so that the starting and stopping of pumps at defendant's plant causes a quick drop and rise of the water level in other wells penetrating the strata; that it also induces underdrainage, lowering the water level in wells throughout the area affected, and is a direct drain upon the supply. Defendant's witnesses differed in their acceptance of the cone of pressure depression theory and questioned some of Mr. Lee's conclusions based upon it.

Several of the property owners and tenants testified that their wells, which formerly produced fresh usable water, had become alkaline after defendant's pumping operations started, and that the amount of water obtained by pumping had so decreased as to seriously extend the hours of pumping and the labor and cost. There was also evidence that land near the ocean, which was formerly productive, had become impregnated with salt and its usefulness had been destroyed. The quality of the water as a whole is poor; the leaching out of salt very difficult. To what degree the deterioration, if any, in the water supply can be attributed to defendant's operations is a subject of uncertainty in the proof.

Mr. Lee concluded that pumping from defendant's wells with its present facilities had caused a lowering of the water level under adjacent privately owned lands, even during periods of strong flow in the river; that such pumping will tend to cause salty water to migrate to fresh water areas, and may cause a reversal of flow with intrusion of salt water from the ocean into the naturally fresh water areas of the valley fill. Defendant's witnesses offered other explanations of the mineralization of the water in plaintiffs' wells. In several of them there was found crenothrix, a clogging bacteria; in some there was said to be evidence of sewage. The return waters from Mexico were said to contain solids which it might take years of irrigation to eventually work out; return waters from use in the United States were also classified as poor in quality. The mesa formations were found to contain con-

nate or ancient entrapped sea water, highly mineralized, and possibly drawn down by the lowering of the water level.

Defendant's witnesses also suggested the so-called Coronado theory of the existence of an impervious dyke or seal, creating an impermeable barrier near the ocean and causing water in the basin to stagnate. Under this theory it was said that the pumping out of the basin and refilling with fresh water of improved quality each year would be beneficial, as would defendant's treatment of the water to remove chemicals. One witness stated that sea water and stagnation might cooperate to form mineralization. Another witness for defendant frankly expressed his opinion that either there is no impermeable barrier which prevents the escape of water from the valley, or else the valley would long since have become a salt marsh.

Another suggestion advanced on behalf of defendant was that regardless of the existence of an impermeable dyke, continued pumping and a lowering of the water table would not be dangerous because of the slow movement of the water underground, found by the trial court to be 1½ to 5 feet a day, with great retardation near the ocean. With this retardation, defendant claimed, its pumping could not draw in salt water, or affect the level of the water table at other points in the valley. Mr. Lee, however, was of the opinion that the basin could not be theoretically separated into compartments so that operations and extraction of water at one point would not affect other localities; also the extraction of 3,200 acre feet per annum might increase the velocity of the underground flow.

One of the defendant's expert witnesses testified to the possible presence of an aquifer, that is, a fresh water containing body of porous, permeable gravel or sand, extending from the valley out on to the continental shelf along the coast line. He stated that if such an aquifer exists, any reduction of the hydraulic head in the underground basin or lowering of the fresh water table would cause salt water to flow up the aquifer. This was said to possibly account for the presence of sea water in some of defendant's wells. Furthermore, salt water, because of its weight, will at times creep in along the bottom of a pervious formation, and pumping too deep in a fresh water well may produce salt water. There is also some lateral percolation from salt water sloughs.

The most plausible theory presented was that of the existence of a fresh water barrier near the ocean, that is, a fresh

water table above sea level between the cone of deprssion and the sea itself, which prevents the intrusion of salt water. With the existence of such a barrier, salt water would be excluded, although a small amount might move in along the bottom of the formation. The term sea level is commonly used to denote the mean of all tides, and hence to preserve the barrier, the fresh water table must be maintained at a sufficient height above sea level to meet the threat of high tides. One witness for defendant expressed the view that if the water table were sufficiently lowered the fresh water divide would progress down stream until it disappeared in the ocean, and it could not then be said that there would be no danger of salt water intrusion. He conceded that inasmuch as the starting of the pumps creates a cone of depression, it would be a precautional measure to see that the wells are not lowered below sea level.

Under their several theories, defendant's witnesses reached the conclusion that the safe yield of the basin has not yet been approached; that no property owner has been deprived of water by defendant's pumping; that even after the surface flow in the river has ceased, defendant can still pump in excess of 3,000 acre feet per annum without injury to overlying owners, or unreasonable lowering of the water table; and that this pumping would affect a conservation of waters which otherwise waste into the ocean. To the contrary, plaintiffs' witness stated that the basin needs a 10 to 15 foot level over the salt water to maintain a sufficient column; that a lowering of the water table would bring in salt water and the owners would have to drill deeper. It was his opinion that when there is no flow at the ocean, the water table has not obtained its maximum height, nor has the basin been fully recharged, and that pumping by defendant should therefore be limited to periods of river flow when the basin is full, the surface flow is reaching the ocean, and the level in pilot wells is 10 feet above sea level, measured when all pumps are running. He would also allow direct diversion near the ocean.

In attacking the findings of the trial court bearing upon the sources of supply for the basin, the dependability of annual replenishment, storage capacity of the underground reservoir, extent to which the water table may safely be lowered, the danger of salt water intrusion, and the ultimate finding of a net safe yield of the basin of less than 6,000 acre feet per annum, with no surplus existent for exportation to points

without the watershed, defendant admits that there is a direct conflict in the opinions and conclusions drawn from the physical facts by the respective expert witnesses. But defendant argues that this conflict is overcome by the physical facts themselves showing the actual and continued existence of a surplus during wet cycles and the continuance of the augmentation of flow to the extent of about 4,500 acre feet per annum from Mexican operations. Therefore, defendant contends that even if the trial court was justified in drafting its findings largely in accordance with the views expressed by plaintiffs' expert witness, Mr. Lee, nevertheless it should have made provision, by retention of jurisdiction, and, if necessary, by reference to the Division of Water Resources, for the use of any surplus so long as it actually exists; that any other conclusion sanctions the waste of water in direct violation of the constitutional mandate (art. XIV, § 3), as interpreted in the leading cases. (*Meridian, Ltd.* v. *San Francisco,* 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105]; *Rancho Santa Margarita* v. *Vail,* 11 Cal.2d 501 [81 P.2d 533]; *City of Lodi* v. *East Bay Mun. Util. Dist.,* 7 Cal.2d 316 [60 P.2d 439]; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.,* 3 Cal.2d 489 [45 P.2d 972, 1014]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351 [40 P.2d 486]; *Gin S. Chow* v. *Santa Barbara,* 217 Cal. 673 [22 P.2d 5].)

It is true that the burden of proving the existence of a surplus is on defendant (*City of Lodi* v. *East Bay Mun. Util. Dist., supra,* 7 Cal.2d 316, 339; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* 3 Cal.2d 489, 535; *Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 381); that the trial court's findings have substantial evidentiary support in the testimony of Mr. Lee and other witnesses for plaintiffs; that the attacks made by defendant upon the testimony of Mr. Lee go only to its credibility and weight; and that these are matters committed to the trier of the facts for determination in the case of an expert as well as of lay testimony (*State Comp. Ins. Fund* v. *Industrial Acc. Com.,* 195 Cal. 174, 184 [231 P. 996], and cases cited; 2 Cal.Jur. p. 930, § 546). But the existence of the Mexican increment in the stream flow, temporarily at least, is an undisputed fact as is also the possibility that through treaty or passage of time the augmentation may become sufficiently dependable to be considered in computing the net safe yield of the basin and adjudging whether

there exists a surplus water supply available for exportation. Therefore, the findings of the trial court bearing on the subject of net safe yield and existence of a surplus must be limited in their effect to the conditions shown to exist in the basin at the time of trial and provision should be made to permit the taking of further evidence under retained jurisdiction and amendment of the findings and conclusions to conform to changing conditions. Under such retained jurisdiction provision may be made for the use of any current surplus over current need. These additional proceedings seem appropriate because of the factors which led the trial court to permit defendant to export 1,100 acre feet of water in each of the years 1942 and 1943, and 550 acre feet in 1944, namely, such factors as wet cycles, Mexican augmentation, and the urgent need of water for domestic use in outside areas due to extensive growth of population.

The Mexican waters are not, as plaintiffs suggest, mere ''waste'' or ''foreign'' waters, but are portions of the natural flow of the stream which, after interruption by storage and irrigation use, find their way back into the surface and underground channel of the river, and flow over the International Boundary, and thence to the sea. Upon entering the United States they are subject to appropriation under the laws of this state just as any other waters of the state. (*Crane* v. *Stevinson,* 5 Cal.2d 387, 394-5 [54 P.2d 1100].)

Defendant concedes that plaintiffs' rights are paramount to its right of diversion and exportation of water, but contends that the amount of water claimed by plaintiffs and allowed them is exorbitant. It is argued that some of the lands which have been awarded water do not overlie the basin and are useless commercially because of salt marsh or alkali, and that the trial court erred in not differentiating between the plaintiffs and appearing cross-defendants whose lands are so located that they cannot be injured by defendant's operations and those whose lands are subject to injury. This argument would carry more weight if the existence of an impervious dyke or fresh water barrier had been established at any definite location along the coast east of any of the overlying lands. But other than in the realm of theory or speculation there is no showing that the underground waters are not so interconnected that damage from defendant's operations through lowering of the water level and percolation of salt or connate water is an existing hazard to all overlying owners.

Defendant did not conclusively show that there were any areas which would not be affected by its pumping operations through pressure shock or mineralization, and plaintiffs' witnesses concluded that the hazard existed as to all of the overlying lands.

Although some lands may overlie clay deposits in the valley fill which are not water bearing, it was not shown that any overlying owner could not get usable water on some portion of this tract. The evidence affords sufficient support for the findings on this subject and also for the conclusion that the water allowances made are not unreasonable or excessive. Complaint is made of an error of description with respect to the Clark lands, and of ownership of the Holderness lands. No objection is interposed to a correction of the findings in these particulars. Such correction, it is assumed, may be made without a modification by this court.

In further attacking the trial court's allowance of water for reasonable, beneficial use, defendant argues that although any arable land, susceptible to irrigation, may be made productive, plaintiffs cannot be expected to plant all overlying lands to crops of high water consuming content, nor can they object to a lowering of the water level below the roots of the larger native brush, thus preventing the considerable loss of water from consumption by such growth. But the constitutional enjoinder against waste does not mean that the riparian owner must either clear all water consuming native growth from his land or else permit a lowering of the underlying water table below the roots even if such lowering is otherwise inadvisable. Water rights are fixed without deduction for inevitable loss through evaporation or consumption by native brush. Neither is an overlying owner, considering the varying toleration of vegetation to salinity, limited to raising only such crops as have a high degree of tolerance. It should be assumed that he has made utility the primary consideration in farming his land and he is entitled to sufficient water for such crops as may normally be raised under conditions of noninfringement of his water supply.

Where owners overlying an underground basin have for many years developed their supply by individual pumping from shallow wells, and such method of use is not unreasonable under the circumstances shown, they are not required to centralize, localize, or scatter their pumping, or to unduly deepen their wells, or to undertake any other operations en-

tailing a substantial increase of cost merely to enhance the surplus for the exporter. The overlying owner "is entitled to make a reasonable use of the water according to the custom of the locality and as long as he does so, other persons can not complain of his acts. The amount of water required to irrigate his lands should, therefore, be determined by reference to the system used, although it may result in some waste which might be avoided by the adoption of another or more elaborate and extensive distribution system." (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* 3 Cal.2d 489; *Joerger* v. *Pacific Gas & Electric Co.,* 207 Cal. 8, 23 [276 P. 1017], and cases cited.)

Defendant contends that the trial court erred in treating the basin as a unit, in taking into consideration and calculating the requirements of all overlying owners, and in issuing a general or blanket injunction. All that is required, defendant urges, is the declaration and protection of the paramount rights of the plaintiffs and the appearing cross-defendants, leaving any water remaining over paramount needs for use under subordinate rights. (*Meridian, Ltd.* v. *San Francisco, supra,* 13 Cal.2d 424; *City of Lodi* v. *East Bay Mun. Util. Dist., supra,* 7 Cal.2d 316.)

But defendant, in its pleadings, and especially in its cross-complaint, put in issue the right of all overlying owners, and it was the theory at the trial, which will be adhered to on appeal (*Marra* v. *Aetna Constr. Co.,* 15 Cal.2d 375, 379 [101 P.2d 490]; *Ernst* v. *Searle,* 218 Cal. 233, 240-1 [22 P.2d 715]; *White* v. *City of San Diego,* 126 Cal.App. 501, 507 [14 P.2d 1062]), that the total draught on the basin was to be considered, for without such consideration there could be no physical solution or safeguard against salt water intrusion. Moreover, defendant persistently sought a reference for the purpose of establishing a physical solution and in its brief repeatedly states that it only wants such surplus waters as may be taken, whether more or less than 3,200 acre feet per annum, without endangering the supply for overlying lands and the quality of the water in the basin as a whole. For determination of these issues the full overlying need must be taken into consideration.

Some of the cross-defendants answered, but others did not appear. We are pointed to no proof of service upon any of them and no defaults were entered. It is stated in the briefs that defendant filed with the clerk of the court a volun-

tary dismissal of the cross-complaint as against all non-appearing cross-defendants. Plaintiffs assert, without citing any transcript reference, that this dismissal was filed on July 13, 1942, after the conclusions of the trial judge were announced and before the entry of formal findings and judgment; that therefore it was not effective under the provisions of section 581 of the Code of Civil Procedure. (See *Jalof* v. *Robbins*, 19 Cal.2d 233 [120 P.2d 19]; *MacDermot* v. *Grant*, 181 Cal. 332 [184 P. 396].) However, both findings and judgment recite the dismissal of the cross-complaint against numerous cross-defendants, presumably all who did not appear, and it must be assumed, there being no showing to the contrary, that all proceedings leading to the judgment were correctly pursued, and that the cross-complaint was regularly dismissed against the cross-defendants named in the recitals of the judgment to that effect. (*Estate of Hart,* 11 Cal.2d 89 [77 P.2d 1082].)

The individual water rights declared by the judgment run only in favor of the plaintiffs and appearing cross-defendants and some of the findings are similarly restricted. The overlying owners who were not parties to the action at the time of entry of the judgment are not bound by it, nor does it specifically run in their favor, although it may be inferentially favorable to them in its protection of the supply as a whole. But the priority of their rights is not here litigated.

If no issue had been raised with respect to the danger of salt water intrusion, the trial court might have declared merely the extent of the water right of those overlying owners who appeared and litigated their claims, and limited its injunctive order to the infringement of that supply, leaving the surplus remaining after satisfaction of prior rights for exportation or other use under subordinate and inferior rights. If no surplus had been shown over the needs of appearing owners, a collective declaration and permanent injunction against exportation would have been proper as in the case of *Corona Foothill Lemon Co.* v. *Lillibridge,* 8 Cal.2d 522 [66 P.2d 443]. But here the salt water intrusion issue was raised, and under the general finding of a net safe yield of the basin of less than the present and prospective need for overlying lands, together with evidence that despite the present water supply there is danger of permanent injury through mineralization and salt water intrusion, plaintiffs and the appearing cross-defendants were entitled to relief which (1) would pro-

tect them to the extent of their individually declared rights (*Meridian, Ltd.* v. *San Francisco, supra,* 13 Cal.2d 424), and (2) would also protect them, pending a physical solution of the water problem, against any exportation of water which would unduly increase their cost of use or lower the underground water level below the danger point.

Defendant contends, however, that even if such relief be deemed proper, the injunctive provision of the decree entered by the trial court is ambiguous and that it is too restrictive, particularly when coupled with the absence of any provision for retention of jurisdiction after December 31, 1944. This contention must be sustained. Paragraph III of the decree provides that after December 31, 1944 (unless the decree be modified on application made before that date, which was not done), the defendant "shall divert and export no water whatever from the underground basin" but that the defendant "is and shall be entitled to divert, take and export any surface flow of the Tia Juana River which otherwise would waste into the ocean." But in paragraph IV of the decree it is provided that after December 31, 1944 (unless the decree be likewise modified, which was not done), the defendant "is wholly enjoined and restrained from diverting and exporting any water from said basin." So long as a considerable surplus flow exists in the valley, even though it is subject to interruption or cessation, its use for proper purposes should be permitted. The provision in paragraph IV of the decree prohibiting the defendant from exporting *any* waters from the basin is too prohibitive and is inconsistent with the provisions of paragraph III allowing the defendant to export surface flow which would otherwise waste into the ocean. Even the latter provision is not broad enough to accomplish that result. There should be a provision in the decree, until further order of the court under a retained jurisdiction, permitting the defendant as during the years 1942, 1943 and 1944, to operate its pumping plants and pump water from its wells on its land and to export that water for the use of its customers when surface waters are flowing in the Tia Juana River, which surface waters, if not intercepted by such pumping operations would waste into the ocean.

Difficulties in the formulation of a decree which will protect the supply and at the same time prevent the waste of surplus water may be experienced, but they should not be deemed unsurmountable. Defendant presented what it con-

sidered a physical solution for the control of its diversion upon the basis of the showing made by a proposed series of test wells, and it agreed to pay for any deepening of plaintiffs' wells or replacement of equipment necessitated by its draught on the basin. There was evidence to the effect that this solution was unworkable and the trial court rejected it. The trial court found that ". . . there is no physical solution which would meet the situation and at the same time permit the defendant . . . without injury to the plaintiffs and the cross-defendants here appearing to permanently export water from the Tia Juana River Valley in excess of the run-off that would otherwise waste into the ocean, *except* the solution hereinbefore in Finding XVII mentioned, to wit, that there be a single over-all agency, either public or private, with unified control and administration of the entire underground and surface flow of the Tia Juana River and Tia Juana River basin from the International Boundary Line to the ocean, together with the construction of a comprehensive distributing system . . . and the construction of such an artificial storage system as would permit the impounding of additional water in flood years for use in other years."

The trial court further found "That owing to present war conditions, and the consequent congestion of population in San Diego County, of which the Court takes judicial notice, and to avoid the risk of accentuating any shortage of water for the supply of such population, and in view of the impracticability in the present war conditions of immediately effecting the desirable unified control of the water supply of said Tia Juana River Valley or of immediately installing the needed comprehensive distributing system or further storage facilities therein, and having in view the present relatively high degree of impregnation of the valley fill of the Tia Juana River Valley, in consequence of the recent, though not indefinitely dependable, addition to the summer underflow of said river across the International Boundary Line, resulting from seepage and the return flow from irrigation from the Rodriguez Dam . . . it is reasonable to permit . . ." the defendant to continue to pump from the underground waters and to export the amounts of water hereinbefore set forth for the years 1942, 1943 and 1944.

The findings indicate that the trial court felt that the only solution feasible at the time of trial, was the plan whereby defendant could pump for exportation only when there was

a surface flow into the ocean. They also indicate that the court did not include the Mexican increment in its determination of the water "yield" of the Tia Juana River watershed. The court found the Mexican increment too undependable to consider in arriving at a permanent solution and expressly considered it only in granting the defendant permission to pump water during the period of retention of jurisdiction. In restricting this pumping to the period up to December, 1944, the court found that the permission granted to defendant to pump "water in excess of that which would otherwise waste into the Pacific Ocean is in its nature temporary, and available only by reason of said heavy impoundment of water in said Rodriguez Dam and of the circumstances that seepage therefrom and return waters from irrigation therefrom in Mexico have not hitherto been intercepted by pumping or otherwise South of the International Boundary Line." If during this period the underground water level was sufficiently supported with water from the Mexican Project so that defendant could pump more water than would normally be allowed under the court's injunction, there is reason to believe that as long as that source of water remains available there may be a surplus for exportation.

By retaining jurisdiction to consider the effect of this added source of water and its dependability for the purpose of working out a solution, the court will be carrying out the policy inherent in the water law of this state to utilize all water available. (*Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501, 560; *Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 368; see 22 Cal. L. Rev. 333, 341; 23 Cal. L. Rev. 540.) Even though the Mexican increment may be an undependable source of water, this water should not remain unused so long as it is available. In order to provide for the full utilization of this water, the trial court has the power to consider this source of supply so long as it is available. (*Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501, 559; *City of Lodi* v. *East Bay Mun. Util. Dist., supra,* 7 Cal.2d 316, 337-341; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* 3 Cal.2d 489, 574; *Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 383.)

From the inception of this case defendant has pleaded for a reference to the Division of Water Resources. The motion was first presented in September, 1937, two years before the filing of the plaintiffs' amended and supplemental com-

plaint. It was opposed by plaintiffs on the ground that it would amount to the retrial of an issue already decided adversely to them by issuance of the appropriation permits to defendant. But the issuance of the permits was not in any sense binding on the plaintiffs. In fact the permits expressly were granted subject to prior rights. The request for a reference was renewed at the commencement of the trial at which time the trial judge expressed himself as "very much tempted to grant it." It was again renewed during the course of the trial, also during the period which elapsed between the filing of the court's memorandum opinion and the entry of judgment. It was once more presented on the argument on the motion made during the pendency of the appeal from the judgment, for modification thereof. No positive duty rests upon the court to refer such a problem to the Division of Water Resources (Water Commission Act, § 24, superseded by Water Code, §§ 2000 et seq.; *Fleming* v. *Bennett,* 18 Cal.2d 518 [116 P.2d 442] ; *Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra,* 3 Cal.2d 489, 575; *Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351), but it may call upon that agency at any time for assistance.

The State, appearing as amicus curiae, asserts that "The Division of Water Resources has been intimately concerned with the problems of the Tia Juana River for over a quarter of a century and has for the past ten years supervised the extractions by its permittee, the appellant, under stringent terms and conditions imposed in its permit as a safeguard against injury to prior overlying right owners, including plaintiffs. The appellant bears the expense of the facilities to be maintained and the data to be furnished to the Division." The State further states that, in view of the fact that adequate consideration has not been given to the stream flow coming from Mexico, a physical solution is possible and that one may be available through the instrumentality of its Division of Water Resources. It is further suggested by counsel for the State that, instead of an absolute injunction in disregard of the effectiveness of that long continued supervision, a declaratory judgment would be proper, coupled with retained jurisdiction placing the state agency supervision under immediate jurisdiction of the trial court, thereby enabling that court promptly to use its injunctive process when or if needed to protect prior rights. The Water Code (§§ 4200, 4201)

authorizes the payment by the State of one-half of the costs of services furnished by the Division and the defendant offered at oral argument and in its supplemental brief, to pay the other half.

One other matter should be mentioned. The city of San Diego filed an amended answer to defendant's cross-complaint and also filed an amended cross-complaint seeking to quiet its title as against defendant, to 420 acre feet of water per annum allegedly necessary for the irrigation of 105 acres of riparian land owned by it. The trial court awarded the city 224.50 acre feet per annum. Defendant contends that the city is estopped from contesting its claim to waters of the basin because a resolution of the governing body of the city approving a contract settling a controversy with defendant's predecessor, contains the recital that defendant "will endeavor to develop an additional and independent supply of water to lessen the burden now resting on the City," and it was this endeavor that led to the Tia Juana development. (See *City of Coronado* v. *City of San Diego,* 48 Cal.App.2d 160 [119 P.2d 359].)

The recital in the resolution, however, does not create an estoppel here. It does not contain any representation, express or implied, that the city will not object to defendant's taking water from the Tia Juana River basin to which it is not entitled, to the damage of other owners. Prior to the filing of the briefs on this appeal the city, which had changed its legal staff, altered to some extent the position it had formerly taken. In its brief it states that it is interested in constructing a dam across Cottonwood Creek at the International Boundary and is negotiating with the Republic of Mexico relative to the matter; that if the judgment herein is res judicata and will foreclose it from asserting any right in connection with the Cottonwood Creek project, it sincerely believes that notwithstanding such fact, public policy and the public interest entitle it to proceed with its plan; but if, on the other hand, the judgment herein is not res judicata as to its right to continue with the proposed development, then it requests that the judgment be affirmed.

So far as the present record shows, the Cottonwood Creek project is only mentioned in passing. No matters concerning the construction of a dam or impounding of waters of that stream have been at issue or decided, and the record affords no basis upon which to pose an answer to the city's

question of res judicata. However, it may be said that the city, the plaintiffs, and the other cross-defendants are not necessarily adversary parties in this action (*Hardy* v. *Rosenthal,* 2 Cal.App.2d 442 [38 P.2d 412]), and the right to construct the proposed dam on Cottonwood Creek and to impound its water has not been here litigated between them.

No retrial is necessary with reference to the prior rights of the plaintiffs and appearing cross-defendants and their present reasonable requirements as established by the judgment. But further consideration should be given to the issues pertaining to the supply of water coming from Mexico which may be available for exportation after the plaintiffs' and appearing cross-defendants' reasonable requirements have been satisfied, and pertaining to a solution to the end that all of the waters of the basin, including those coming from Mexico, may be beneficially used.

On oral argument counsel for plaintiffs stated that he had no objection to incorporating in the decree a proper provision for continuing jurisdiction, and the decree should be modified in general as determined by the District Court of Appeal for the Fourth District (157 P.2d 663, 680).

It is ordered that the following paragraph, to be number VII A, be and the same is hereby added to the decree:

"Defendant and cross-complainant, California Water & Telephone Company may operate its pumping plants and pump water from its wells on its land in the Tia Juana Valley and export that water for use by its customers when surface river waters are flowing in the bed of the Tia Juana River and which surface waters, if not intercepted by such pumping operations, would waste into the ocean."

It is further ordered that paragraph VIII of the decree be and it is hereby stricken and in lieu thereof the following is inserted:

"The court hereby reserves jurisdiction in this action over the parties and the subject matter so that on the application of any party hereto, or the successor in interest of any party, it may take new evidence on the amount of water seeping or released from the Rodriguez Dam and the amount of return waters from the Rodriguez Project reaching and crossing the line between Mexico and the United States either in the underground sands or by the surface flow of the Tia Juana River; also on the subject of any change in conditions of water supply in the portion of the Tia Juana Basin in the United States

since the date of the judgment; and with the right to make modified or additional findings of fact and conclusions of law, and to modify the decree accordingly.''

As so modified the decree is affirmed, no party to recover costs on appeal.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.